In re SABRE FARMS, INC., a Montana corporation, Debtor.

Dennis A. REPP dba R Land Company, Plaintiff,

v.

SABRE FARMS, INC., and Mervin Leonard, Defendants.

Mervin LEONARD, Third-Party Plaintiff,

v.

FIRST INTERSTATE BANK OF OREGON, a national banking association, Third-Party Defendant.

Bankruptcy No. 381–01950.
Adv. No. 81–0532.

United States Bankruptcy Court,
D. Oregon.

Aug. 31, 1982.

**534**

Charles R. Markley, Portland, Or., for Repp.

Jerome Shulkin, Seattle, Wash., Norman Wapnick, Portland, Or., for debtor.

Gary W. Lindberg, Portland, Or., for First Interstate Bank.

## MEMORANDUM OPINION

HENRY L. HESS, Jr., Bankruptcy Judge.

This adversary proceeding concerns the rights of plaintiff Dennis A. Repp dba R. Land Company, ("Repp") and Third-Party defendant First Interstate Bank of Oregon, N.A., ("Bank") to the rents collected by defendant Marvin Leonard, ("Leonard") from various sub-lessees of real property leased by Repp to debtor, defendant, Sabre Farms, Inc., ("Sabre"). The real property involved will be referred to as Parcel A.

Repp asserts an interest in the rents of Parcel A as the original lessor, since Sabre is in default under its lease.

Bank asserts an interest in the rents by reason of its rights as a secured creditor of Sabre.

Sabre did not take part in the trial.

Leonard asserts that any liability he may have for the payment of the rental monies to Repp or Bank should be reduced by certain actual and pro-rated charges to the property. Leonard further asserts that any entitlement of Repp for rent should be in the subject bankruptcy as a general unsecured creditor for the period to May 4, 1981, and as an administrative claim for the period May 5, 1981 to August 31, 1981.

Repp was and now is the owner of the real property located in Umatilla, County, Oregon, hereinafter referred to as Parcel A.

Bank, formerly known as First National Bank of Oregon, is a national banking association authorized to transact business in Oregon.

Leonard was appointed in January of 1981 as receiver of certain property of debtor Sabre Farms.

Sabre was and now is a Montana corporation and is the debtor in Bankruptcy Case No. 381–01950, a Chapter 11 proceeding filed on May 15, 1981 in the United States Bankruptcy Court for the District of Oregon.

On July 30, 1976, Repp leased Parcel A to Sabre. The lease provides:

"1. Lessee will pay to lessor annually the following amounts each year, due and payable on or before the indicated dates:

August 25, 1977—$275,000

August 25, 1978—$275,000

August 25, 1980—$297,600

August 25, 1980—$297,600

August 25, 1981—$297,600"

The lease also contains provisions with regard to the maintenance and cost of the irrigation system and provides:

"3. Lessee, during the term of this lease, covenants and agrees with lessor: * * * (b) To keep and maintain all irrigation equipment, fences and other appurtenances on said property in as good repair and condition as they are when it takes possession, ordinary wear and tear excepted.

" * * *

"(5) The cost of delivering the necessary irrigation water from the pumping stations located in Section 14 shall be borne exclusively by the lessor during the term of this lease. The costs shall include electricity charges and repairs to the irrigation system."

The lease term was "for a term of five (5) years from and after the first day of September, 1976, and to the end of the 31st day of August, 1981. * * *."

The lease also provided that " * * * growing crops on the land at the time this lease expires shall remain the property of the lessee and it shall have the right to enter on the premises and remove the crops after the term of the lease has expired. Any perennial crops planted by lessee shall become the property of lessor subject to lessee's right to remove the foliage therefrom growing in the year 1981."

Bank loaned money to Sabre for farming operations from time to time. The unpaid balance due Bank by Sabre exceeds $12,-000,000. As part of these loan transactions, Bank obtained a security agreement and filed financing statements.

The security agreement taken by Bank dated February 8, 1980, was executed by Walter J. Reed, then President of Sabre. By the security agreement, Sabre granted to the Bank a security interest in, among other things, all crops on lands owned or being purchased by Sabre (Section 3.1), all crops on lands occupied by Sabre as lessee (Section 3.2), all leasehold interests in lands describe in Section 3.2 (Section 3.11), all rentals payable pursuant to any lease or sublease of any of the lands described in Section 3.1 or 3.2 (Section 3.12), all Sabre's contract rights, accounts, and general intangibles, now or hereafter arising (Section 3.10), and all proceeds of or relating to any of the collateral (Section 3.8).

Section 3.1 describes property which does not include Parcel A. Section 3.2 includes all of Parcel A with the exception of that part of Parcel A lying in Section 27, Township 3 North, Range 26 E.W.M.

On January 15, 1976 the bank filed a financing statement with the county filing officer of Morrow County, Oregon. This financing statement refers to an Exhibit A for the description of the property upon which the crops were to be grown. The copy of the financing statement which was' introduced in evidence (Bank Ex. 6) does not attach a copy of Exhibit A. The court therefore does not know if the original attached Exhibit A or, if it did, whether Exhibit A described any part of Parcel A. In rendering this opinion the court will assume that the financing statement which was filed did attach an Exhibit A and that such exhibit failed to describe any part of Parcel A as was the case of the Exhibit A attached to the financing statement filed with the Secretary of State.

The financing statements filed with the Secretary of State and the county filing officer describe the collateral as:

"All of the following now owned or hereafter acquired or arising: Debtors equipment, inventory, accounts, contract rights, general intangibles and farm products including but not limited to crops and supplies. The crops as to which the secured party claims a security interest are growing or to be grown or stored on the property described in Exhibit A attached hereto and by this reference made a part hereof."

Exhibit A attached to this financing statement does not describe any of Parcel A.

In the spring of 1980, Sabre entered into an agreement with Sunriver Farms, Inc.,

for the sale of all of Sabre's property. In the agreement Sabre agreed to sublease Parcel A to Sunriver Farms, Inc., an Oregon corporation ("Sunriver").

In November of 1980, Sabre declared its contract of sale with Sunriver in default and gave notice to Sunriver of its intent to take possession of Parcel A. Sunriver filed a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Oregon, No. 380–03279 on December 18, 1980.

On January 12, 1981 Sabre filed an adversary proceeding in the United States Bankruptcy Court for the District of Oregon, No. 81–0019, in the Sunriver Bankruptcy seeking to foreclose on the collateral which Sunriver had granted to Sabre. In that proceeding, on January 21, 1981, *nunc pro tunc* January 12, 1981, the court appointed Leonard as receiver of the collateral. After his appointment, Leonard assumed control of all of the collateral, real and personal, which Sunriver had granted to Sabre. He assumed control of Parcel A even though Parcel A was not subject to the order appointing him receiver. Leonard's control of Parcel A was as a representative and with the authority and consent of Sabre Farms, both individually and later as a debtor in possession.

Beginning about March of 1981, Leonard leased the circles on Parcel A to various lessees. At the same time he was leasing the circles on Sabre Farm. Some of the lessees leased circles both on the Sabre Farm and on Parcel A.

Leonard managed the Sabre Farm and Parcel A as one farm. Certain expenses he was able to charge directly to Parcel A such as CID water charges, others such as labor, repairs and fuel were pro-rated to Parcel A.

On May 5, 1981, Sabre filed a petition under the Chapter 11 of the Bankruptcy Code.

Leonard collected rents from the lessees of the Sabre Farm and Parcel A. He kept all the monies in his receivership account. He paid all expenses for the Sabre Farm and Parcel A from his receivership account.

He made monthly reports to the court in which he reported all income and expenses.

The money Leonard collected on Parcel A and the Sabre Farm less expenses paid are on deposit at the Umatilla Branch of Bank.

### BANK'S INTEREST IN RENTALS

■ The Bank obtained a security interest in the rentals received by Leonard under sections 3.10, 3.11 and 3.12 of the security agreement. Sections 3.11 and 3.12 include leasehold interests and rentals from farm lands described in section 3.2, which latter section describes substantially all of the property in Parcel A. While the filed financing statements do not specifically use the terms "leasehold interests" or "rentals," they include the terms "contract rights" and "general intangibles." " 'contract' means the total legal obligation which results from the parties' agreement as affected by the Uniform Commercial Code and any other applicable law." ORS 71.-2010(11). The right to receive rent from a lease of land is a contract right. " 'General intangibles' means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." ORS 79.1060(2). The right to receive rent under a lease of land is a general intangible. The bank therefore had a perfected security interest in the rentals received by Leonard from sublease of Parcel A.

### LIEN OF REPP

Repp claims a lien upon the rentals received by Leonard.

The lease from Repp to Sabre makes no provision for a lien against crops or any other personal property such as rent due from a sublessee. There is therefore no consensual lien against the rents received by Leonard under the terms of the lease.

■ Oregon common law recognizes the remedy of distress. This remedy gives the landlord the right to distrain whatever goods or chattels the landlord finds upon the premises whether they belong to a tenant or a stranger. Growing crops are goods

and chattels which may be distrained. Distraint is however limited to physical property which the landlord takes into possession.

■ Oregon statutory law also provides for a landlord's lien. ORS 87.162(1). Such lien does not extend to crops belonging to a sublessee. *Yoshida v. Security Insurance Co.,* 145 Or. 325, 26 P.2d 1082 (1933); *Smith v. Chipman,* 220 Or. 188, 348 P.2d 441 (1960).

The plaintiff filed his complaint herein on October 2, 1981. In the complaint the plaintiff asserts a lien against the crops on Parcel A under the common law lien of distraint and the statutory landlord's lien provided by ORS 87.162(1). The plaintiff named the sublessees from Sabre and Leonard as defendants. On October 22, 1981 a stipulated order was entered which provided that " * * * any claim which plaintiff may have to the crops grown or growing on the premises is hereby released and the rent proceeds described above are hereby substituted in place." Under the terms of this stipulated order if the plaintiff is to have a lien against the rentals received by Leonard it is necessary to first find that Repp had a lien against the crops and next determine the value of those crops in order to determine what portion of the rents should stand in place of the lien on such crops. The court need not determine the first of these issues since there was no evidence presented to show the value of the crops upon which Repp claimed to have a lien.

The bank's contention that under ORS 87.146(1)(a) its security interest in the crops had priority over any landlord's lien on the crops is not well founded. The bank did not have a perfected security interest in the crops grown on Parcel A. The security agreement provides for a security interest in the crops growing or to be grown on Parcel A. The financing statements filed with the Secretary of State and the county filing officer show a security interest in crops growing or to be grown upon land described in an attached exhibit. No part of Parcel A is described in the attached exhibit.

As noted above the bank did, however, have a perfected security interest in rentals owing to Sabre by use of the term "general intangibles" in the security agreement and the financing statements.

■ The bank's security interest in rentals attached as soon as such rentals became due. The stipulated order of October 22, 1981 was not executed by the bank and the bank has not during the course of these proceedings agreed to subordinate its security interest in rentals from the subleases to the claim of Repp. Thus even if the court were to determine that Repp had liens against the crops and that these liens be released in return for a lien against the rent proceeds, Repp's lien would be inferior to the bank's security interest in the rentals since the Bank's perfection of a security interest in rentals was prior to October 22, 1981.

## RENT AND QUANTUM MERUIT

Repp contends that Leonard and Bank have received substantial benefit from the use of plaintiff's property to his detriment and are thus liable for the reasonable value of that benefit.

The period for which rent is due to Repp under the terms of the lease is from September 1, 1980 to August 31, 1981. This rent became due on August 25, 1981.

In the spring of 1980 Sabre subleased Parcel A to Sunriver Farms, Inc., an Oregon corporation ("Sunriver").

In November of 1980 Sabre declared its contract with Sunriver in default and gave notice to Sunriver of its intent to take possession of Parcel A. On December 18, Sunriver filed a Chapter 11 proceeding in this court. On January 12, 1981 Sabre filed a complaint to foreclose against Sunriver. As of January 12, 1981 the bankruptcy court, in the foreclosure proceeding, appointed Leonard as receiver of the collateral. Leonard assumed control of Parcel A even though it was not subject to the order appointing him as receiver. Leonard at that time was acting as a representative of Sabre in his control of Parcel A. Beginning

about March 1981 Leonard leased the circles on Parcel A to various lessees. On May 5, 1981, Sabre filed a petition with this court under Chapter 11. Thereafter Leonard collected rents from the lessees of Sabre Farm and Parcel A.

■ There were nine subleases entered involving Parcel A. All but two of the leases were entered before Sabre filed its Chapter 11 petition. All but two of the leases were signed by Lawrence Lindsay, president of Sabre. Two of leases show Sabre as the lessor. The balance of the leases show the landlord to be Leonard, receiver. The evidence shows that Leonard was not acting as a receiver appointed by the court in regard to Parcel A but that he was acting as an agent for Sabre prior to the chapter 11 petition and as an agent for Sabre as debtor in possession after the filing of the chapter 11 petition. Repp's claim for rent must be divided into two parts. One part is the rent which accrued from September 1, 1980 to May 5, 1981, the date of the Chapter 11 petition. This portion of the claim is for rent at the agreed rental provided in the lease and constitutes a general unsecured claim without priority in the chapter 11 estate of Sabre. The other portion of Repp's claim is for rent between the dates of May 5, 1981 and August 31, 1981, the termination date of the lease. This portion of the claim is for reasonable rent and constitutes a claim with administrative priority.

In determining the amounts of those two claims it is necessary to view the lease (Ex. 1) and the letter from Repp to Walter J. Reid (Ex. 2). While the lease provides that the rent for the year 1980–81 is $297,600, the letter provides that Repp will pay electrical charges of $87,080.54. If the electrical charges paid by Repp are more than that sum Sabre is to reimburse Repp for the difference. If the electrical charges are less than that sum Repp is to pay the difference to Sabre. Thus the net to be received by Repp, after payment of electrical charges, is $210,519.46. During the crop year 1980–81 Leonard, being unaware of Repp's obligation to pay $87,080.54, paid all of the electrical charges (sometimes referred to by the parties as water charges) except the three items shown in the exhibit attached to Repp's proof of claim (which three items are mentioned later in this opinion). Thus the total rent for the crop year 1980–81 owing to Repp is the stated rent of $297,600 less the sums of $87,080.54 which was his obligation to pay.

■ There was controversy as to whether the sums for which Leonard leased Parcel A to others constituted a reasonable rental. The court concludes in view of the conflicting evidence of rental value that the rental provided in the lease and the letter provides the best measure of reasonable rental value after the filing of the Chapter 11 petition. A farm lease of property of the nature here involved cannot be a lease for a month at a time. For farming purposes Parcel A would have no value for a term less than would be required to prepare the ground, plant a crop and harvest the crop. It therefore would be inappropriate to assign a different rental value to one part of a year than to a different part of the year. Thus the rental should be the same for both the pre-petition and post-petition period of the 1980–81 year. It is also appropriate that the rental for the entire twelve month period be prorated without regard to when subleases were entered, when charges were made for electricity, when payment of such charges were made, when crops were planted or when such crops were harvested. Repp is entitled to the agreed rent, less any charges for electricity paid by Sabre, Leonard or the Bank up to $87,080, the court having found that the post-petition reasonable rent is the same as the agreed pre-petition rent. Repp has no responsibility for any expenses incurred by Sabre or Leonard except his obligation to pay $87,080 in water charges. All of the subleases were entered into for the benefit of Sabre. Leonard was acting as an agent for Sabre both before and after the Chapter 11 was filed. It is of no more concern to Repp whether the net from the subleases, after Leonard's expenses, amounted to more or less that the rent agreed upon in the lease

between Repp and Sabre than it would have been to Repp whether Sabre made money or lost money had Sabre itself farmed Parcel A.

Exhibit 11 lists expenses incurred by Leonard in connection with Parcel A. The first item on this exhibit shown at "Water" represents electrical charges for the crop year 1980–81. The total of such charges was $133,156.60. Under the lease Sabre is not entitled to a credit for the entire sum but only the amount of $87,080.54. The balance of the electrical charges are expenses for which Repp is not responsible. Repp has no responsibility for any of the other expenses shown upon Exhibit 11. Repp's total claim for rent for 80–81 is therefore $297,608 less electrical charges paid by Leonard to the extent of $87,080.54 or $210,519.46. Of this 8/12 or $140,346.31 represents a general unsecured claim against the estate of Sabre for pre-petition rent and the balance of $70,173.15 represents a post-petition claim entitled to administrative priority. In addition Repp has a general unsecured claim against the estate of Sabre in the amount of $1,844.03 for excess electrical charges paid by Repp during the year 1979–80. (Ex. 26).

█ Quantum meruit has no application to these circumstances. In bankruptcy it can be said that almost all creditors have supplied some benefit to the debtor's estate. Unsecured creditors share on a pro rata basis without regard to the question of what contributions they may have made to assets remaining in the estate at the time of bankruptcy. Those creditors who have perfected security interests in particular assets of the estate must be paid in full from those assets before the unsecured creditors may share in any excess received from the liquidation of those assets. In this case Bank had a perfected security interest in the rentals from the subleases. The Bank is entitled to receive all of such rents after deduction of Leonard's expenses up to the amount owing under its security agreement. The amount owing to the bank under its security agreement far exceeds even the gross amounts of rentals received by Leonard. Bank is therefore entitled to whatever sums remain in the hands of Leonard which came from rentals under the subleases.

## LIABILITY OF BANK TO REPP

█ Repp contends that, by furnishing land upon which Sabre or Leonard received rentals from subleases, Repp conferred a benefit upon the bank for which it should be responsible to Repp on the basis of quantum meruit. This contention is wholly without merit. A creditor with a perfected security interest in collateral has no liability to unsecured creditors of its debtor nor is its security interest in any way diminished because unsecured creditors have contributed to creation of the collateral. If a landlord desires to have a priority for his rent over the other creditors of the tenant the landlord may provide for a security interest in the lease and perfect such security interest by the filing of a financing statement. Other than the common law possessory lien of distress, the statutory landlord's lien, and the bankruptcy right to administrative priority for use and occupancy by a trustee or a debtor in possession, the law does not provide any priority as such to a landlord over other creditors whether they be secured or unsecured. The bank therefore has no liability to Repp.

## REPAIRS

█ Repp contends that Leonard is liable to him for damages by failing to repair personal property utilized in the farming of Parcel A. The lease provides that the lessee keep and maintain all irrigation equipment, fences and other appurtenances on Parcel A in as good repair and condition as they are when it takes possession, ordinary wear and tear excepted.

Repp's proof of claim not only is for rent but also includes a claim for damages for failure of Sabre to maintain the irrigation equipment in a proper state of repair. Exhibit 13 is a list of repairs asserted to have been made by Repp after he took possession which should have been made by Sabre or Leonard. It appears that Repp is correct in only some of these items.

The first item on Exhibit 13 is the cost of the repair of a rupture in a feeder line. The evidence establishes that this rupture existed before Repp retook possession, that normal maintenance would require repair of such rupture and that the cost to Repp of such repairs in the amount of $1,440 was reasonable. This item of repairs must therefore be allowed.

The second item is $48,598 to replace missing fertilizer tanks and pumps. This sum represented the cost of new tanks and pumps. All but a few of the tanks and pumps are still in the possession of Leonard and have been stored by him for safekeeping. Leonard claims no ownership in these items and Repp may have them for the asking. The value of any missing pumps and tanks is less than the purchase price paid by Repp for new pumps and tanks. This item of Exhibit 13 is not allowable.

The third and fourth items are for repairs to 6B1 and 6B2 stations in the amounts of $856.00 and $2,175.00. These sums represent repairs which should have been made by Sabre and therefore represent allowable claims.

The fifth item is for pivot repairs amounting to $18,255.41. The evidence establishes that such repairs were reasonably necessary, that the cost of such repairs was reasonable, and that such repairs should have been made by Sabre. This item therefor represents an allowable claim.

Since items 1, 3, 4, and 5 represent repairs which should have been made by Sabre after it filed its Chapter 11 petition, the cost of such repairs constitute an allowable claim with administrative priority in the amount of $22,721.41.

## CONVERSION

 While not presented as an issue in the pretrial order, during the trial Repp contended that Leonard had converted property belonging to Repp. Leonard testified that he had taken pumps and tanks in from the field for safekeeping, that Repp had not, prior to the date of trial, asked for their return, and that he, Leonard, agreed to return the pumps and tanks. Under these circumstances there was no conversion of the pumps or tanks and Repp may have them for the asking.

## TAXES

 The lease requires that the lessee " * * * pay all real estate and personal property taxes assessed against the leased property prior to such time said taxes become payable."

The court has determined that reasonable rental for the period after the Chapter 11 petition was filed was the same rental provided in the lease. This would include the obligation to pay such taxes as are required by the lease.

Real property taxes are assessed on a fiscal year basis from July 1 to June 30 of the following year and are payable in installments of one-third, with the first installment due November 15, the second installment on February 15 and the third installment on May 15. The proof of claim filed by Repp claims the sum of $7,399.28, including a statutory penalty, for taxes due May 15, 1981 which were not paid. Since this installment became due after the chapter 11 petition was filed, this portion of the claim must be allowed as an unsecured claim with administrative priority.

The proof of claim also asserts a claim for $3,523.47 for taxes due 11/15/81. Since this installment did not become due prior to the end of the lease term, there was no obligation under the lease for payment of this installment. There is no reason to prorate the installment due on November 15, 1981 for the period that Sabre was in possession after July 1, 1981. Under the terms of the lease there was no provision for prorating the payment of taxes which became due on November 15, 1976 even though the lease term did not commence until September 1, 1976.

## RENTAL AFTER LEASE EXPIRATION

 In the exhibit attached to Repp's proof of claim there is an item for $873.26 per day from August 26, 1981 through the date that Sabre, Leonard and the sublessees

vacate Parcel A at least until October 22, 1981.

The lease provides in part:

"Any growing crops on the land at the time this lease expires shall remain the property of the LESSEE and it shall have the right to enter on the premises and remove the crops after the term of the lease expires. Any perennial crops planted by LESSEE shall become property of the LESSOR subject to LESSEE'S right to remove foliage therefrom growing in the year 1981."

The evidence shows that the possession exercised by Sabre, Leonard and the sublessees was not an exclusive possession and was only for the purpose of removing crops planted by the sublessees and the foliage from perennial crops. As a result Repp has no claim for rent after expiration of the lease on August 31, 1981.

### C.I.D. CHARGES

■ Repp's proof of claim includes an item of (1) $16,066.04 plus interest at the rate of 9% per annum from 10/1/81 for Columbia Improvement District water charges furnished the property before 6/1/81; (2) $15,806.82 plus interest from 10/1/81 for Columbia Improvement water charges furnished the property before October 1, 1981; and (3) $19,268.01 (approximately) for Columbia Improvement District maintenance charges in respect to irrigation water furnished the property, which charges were incurred on or about 5/12/81.

Exhibit 11 shows that through September 1981 Leonard paid water charges totalling $133,156.60. It cannot be determined from Exhibit 11 however whether this sum included payment of the above 3 items. Under the lease it was the obligation of Sabre to pay the water charges exceeding $87,080.54. Earlier in this opinion it has been determined that Sabre is entitled to a credit against the rent of $297,600 in the amount of $87,080.54 for water charges which should have been paid by Repp. This latter sum exhausts any credit Sabre is entitled to receive for water charges paid by Sabre or Leonard to Columbia Improvement District (CID). Therefore it was the responsibility of Sabre to pay the above 3 sums to CID. There was no evidence presented to indicate that these 3 items do not represent appropriate claims. The proof of claim is entitled to a presumption that it is correct in the absence of such evidence. Since these items were incurred after the Chapter 11 petition was filed they represent claims entitled to administrative priority in the principal sums indicated totalling $51,140.87.

### ATTORNEY FEES

■ The proof of claim seeks attorney fees of $10,000 incurred in evicting Sabre and Leonard and for collecting rent. This portion of the claim is not allowable. There is no provision in the Bankruptcy Code for recovery of attorney fees for the filing of a complaint for relief from the automatic stay nor for the preparation of a proof of claim or for establishing the allowable amount of such claim upon objections to the proof of claim. There was no evidence presented to the court regarding the reasonable amount of such attorney fees had they been recoverable.

### CONCLUSION

From the above findings the court concludes that Repp has no lien against the rental proceeds in the hands of Leonard. The court also concludes that if it were determined that Repp had a lien upon the rental proceeds, his lien would be inferior to the perfected security interest of the bank. The court also concludes that the proof of claim filed by Repp must be allowed herein against the estate of Sabre as a general unsecured claim for pre-petition rental for 1979–80 of $1,844.03 and for pre-petition rental for 1980–81 of $140,346.31 or a total of $142,190.34, and as an unsecured claim with administrative priority for post-petition rent of $70,173.15, for repairs of $22,721.41, taxes of $7,399.28 and CID charges of $51,140.87 or a total of $151,434.71.

This memorandum opinion shall constitute findings and conclusions under Bankruptcy Rule 752.