In the Matter of **LEASING CONSULT-ANTS, INCORPORATED,**
Bankrupt.

George **FELDMAN,** Trustee,
Petitioner-Appellee,

v.

**FIRST NATIONAL CITY BANK,**
Respondent-Appellant.

No. 794, Docket 73–1152.

United States Court of Appeals,
Second Circuit.

Argued May 1, 1973.

Decided Sept. 25, 1973.

368

Zalkin & Cohen, New York City (Henry L. Goodman, Harold N. Schwinger, New York City, of counsel), for respondent-appellant.

Hahn, Hessen, Margolis & Ryan, New York City (Lawrence G. Novick, Daniel A. Zimmerman, New York City, of counsel), for petitioner-appellee.

Before FRIENDLY and HAYS, Circuit Judges, and JAMESON, District Judge.*

JAMESON, District Judge:

Respondent-Appellant, First National City Bank (Bank), appeals from an order of the district court affirming, on a petition for review, the order of a referee in bankruptcy directing the Bank to turn over to the Petitioner-Appellee, George Feldman, Trustee in Bankruptcy (Trustee) of Leasing Consultants, Incorporated, (Leasing) the proceeds from the sale of equipment which had been leased by Leasing, located in New York, to Plastimetrix Corporation, located in New Jersey. The leases covering the equipment had been assigned to the Bank as security for a loan to Leasing.

The district court held, 351 F.Supp. 1390, on the basis of stipulated facts, that the perfection by the Bank by filing and possession in New York of its security interest in the lease/chattel paper was not a perfection of the Bank's security interest in Leasing's reversionary interest in the leased property, located in New Jersey. Consequently, the Trustee's lien was held superior to the Bank's unperfected security interest in the leased equipment.

*Summary of Facts*

In March and June of 1969 Leasing entered into eight leases with Plastimetrix covering heavy equipment. The leased equipment was at all relevant times located in New Jersey. Leasing filed financing statements with the Secretary of State of the State of New Jersey covering each transaction, each statement bearing the legend: "THIS FILING IS FOR INFORMATIONAL PURPOSES ONLY AS THIS IS A LEASE TRANSACTION."

On December 15, 1969 Leasing entered into a "Loan and Security Agreement" with the Bank for the financing of its business of purchasing and leasing equipment. The agreement provided in part for the assignment of "a continuing security interest in the lease(s) and the property leased" as collateral security for advances and loans not to exceed 80% of aggregate unpaid rentals.

Pursuant to the security agreement Leasing borrowed money from the Bank in December, 1969 and February, 1970 and assigned as collateral security the eight Plastimetrix leases, each assignment covering all moneys due or to become due under the lease and the "relative equipment" described in the lease. The lease documents were delivered to the Bank.

On December 30 and 31, 1969 the Bank filed financing statements against Leasing with the Secretary of State of the State of New York and the Registrar of the City of New York, Queens County, where Leasing had its principal place of business.[1] No financing statements were filed by the Bank in New Jersey; nor did the Bank take possession of the leased equipment.

On October 14, 1970 Leasing was adjudicated bankrupt by the United States District Court for the Eastern District of New York. On October 30, 1970 Plastimetrix filed a petition under Chapter XI of the Bankruptcy Act in the United States District Court for the District of New Jersey.

The leases were in default and an offer was made to purchase the Bank's interest in the property for $60,000. On May 21, 1971 the Trustee, the Bank, and the purchaser entered into a stipulation providing for acceptance of the offer

---

* Of the United States District Court for the District of Montana, sitting by designation.

1. The financing statement covered "continuing security interest in leases and any and all rents due and to become due thereunder, including all related equipment described therein, chattel paper represented thereby, accounts receivable therewith and proceeds arising therefrom."

and execution of bills of sale by the Trustee and Bank covering all "right, title and interest" in the property, and that the sum of $60,000 "be substituted for the Property" and the "respective rights of the Trustee and of the Bank * * * be impressed upon and relegated to said fund of $60,000 with the same priority and to the same extent as they now have against the Property."

The Trustee petitioned the Referee in Bankruptcy for an order directing the Bank to turn over to the Trustee the sum of $60,000. Under stipulated facts the Trustee and Bank agreed that the question presented was solely one of law —involving the construction of Article 9 of the Uniform Commercial Code—and that the precise issue was:

"Was the Bank required to file a financing statement against the Bankrupt with the Secretary of State of New Jersey in order to perfect a security interest in the leases assigned to it and the equipment leased thereunder by the Bankrupt to Plastimetrix?"

The Referee answered in the affirmative and ordered the Bank to turn over the $60,000, with interest, to the Trustee. On review the district court affirmed.

### Decision of District Court

■ As the district court recognized, the aim of Article 9 of the Uniform Commercial Code, relating to "Secured Transactions", is "to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty". Uniform Commercial Code, § 9–101, Official Comment. The drafters of

2. Where a lease is intended as a security device the lessee usually becomes the owner or has the option to become the owner of the property at the end of the lease term. U.C.C. § 1–201(37). The lessor holds merely a security interest and has no reversionary right in the leased property.

3. "Chattel paper" is defined by U.C.C. § 9–105(1)(b) as:

this article eliminated many distinctions among security devices based on form alone. On the other hand, distinctions based on the type of property constituting the collateral were retained. *Id.*

■ Based on the stipulation of counsel, the court assumed that the agreements between Leasing and Plastimetrix were "true leases" and not "conditional sales agreements" or devices intended to create only a security interest.[2] Accordingly the court found that the Bank acquired "a security interest in both the right to receive rental payments under the lease and in the reversionary interest in the underlying equipment."

The court held, and the parties agree, that the leases themselves were "chattel papers" (U.C.C. § 9–105(1)(b))[3] and that the Bank's security interest in the chattel paper was perfected by filing financing statements in New York and taking possession of the leases. U.C.C. § 9–304(1), 9–305, and 9–102(1).

The court held further: "By contrast, the machines themselves constituted 'equipment' located in New Jersey and hence, for perfection purposes, came within the scope of the New Jersey requirements." The Bank having failed to perfect its interest in the reversion in New Jersey, the court concluded that the Trustee "—a lien creditor within the meaning of Uniform Commercial Code § 9–301(3)—has priority over an unperfected security interest under § 9–301(1)(b)."

Emphasizing the distinction between rights under the chattel paper and the reversionary interest in the equipment, the court quoted from Professor Levie as follows:

"In one situation the purchaser of a security agreement may have an ad-

". . . a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods. When a transaction is evidenced both by such a security agreement or a lease and by an instrument or a series of instruments, the group of writings taken together constitutes chattel paper;"

vantage over the purchaser of a lease. Where [he] purchases equipment leases, he takes only an assignor's interest in the equipment lease itself. If [he] wishes to be secured by an interest in the goods as well, he must obtain a security interest \* \* \* [in the goods] and perfect it." Levie, Security Interests in Chattel Paper, 78 Yale L.J. 935, 940 (1969).[4]

The district court concluded:

"The distinction between the rights represented by the lease and those represented by the reversionary interest in the equipment is a real one, supported by logic and precedent. To ignore the distinction contributes neither to clarity nor uniformity under the Uniform Commercial Code. Moreover, it may mislead third party creditors. The simple solution for a bank in the situation of petitioner is to file notices as to its interest in the reversion in accordance with the law of the state where the equipment is located."

### Contentions of Appellant

Appellant Bank contends that (1) whether the leases be considered "true leases" or security devices, the filing of the security interest in New York (where lessor and the chattel paper were located) covered all of the lessor's rights in the rentals and related equipment wherever located, without a separate filing against the equipment; or (2) alternatively, if a distinction is recognized between a "true lease" and a security device, appellant is entitled to an evidentiary hearing to determine whether the instruments were "true leases" or security interests in the equipment through the device of a lease; and (3) in any event, Leasing in fact had no "reversionary" interest in the property leased to Plastimetrix.

### Failure to File Financing Statement in New Jersey

In contending that the filing and physical possession of the lease instruments in New York were sufficient to cover the leased equipment located in New Jersey, appellant argues that the "reversionary interest" of Leasing is "an intangible interest,[5] sited at Leasing's domicile in New York, and not in New Jersey." If the reversionary interest in the equipment were characterized as a "general intangible", the Bank's security interest in the equipment would have been perfected when it filed with the New York Department of State and in the county in which Leasing had a place of business. N.Y.U.C.C. §§ 9–103 (2), 9–401(1)(c) (McKinney 1964).

 The policies of the Code, however, militate against such an interpretation. We agree with the district court that the reversionary interest is an interest in "goods"[6] rather than an inter-

---

4. The court continued:
 "Practical considerations support this conclusion. The property leased was heavy manufacturing equipment. A potential creditor observing these complicated and non-portable machines should be entitled to believe that he could discover all non-possessory interests by consulting the files in the state where the equipment is located. The equipment was obviously of great value; the New Jersey files revealed only that the lessee held it under a lease. Since the lease agreement required each piece of equipment to have a plate affixed indicating that it was the 'property' of the lessor, judgment creditors of the lessor might assume that its reversionary interest in the equipment was of substantial value. Not being alerted to the diminution of value which would be effected by the creditor's security interest, they might then, for example, attach the lessor's interest, relying on an apparently unencumbered and valuable reversionary interest."

5. "General intangibles" are defined in U.C.C. § 9–106 as "personal property (including things in action) other than goods, accounts, contract rights, chattel paper, documents and instruments." The Official Comment to U.C.C. § 9–106 lists as examples of general intangibles goodwill, literary rights, rights to performance, copyrights, trade-marks, and patents.

6. "Goods" are defined by U.C.C. § 9–105(1)(f) as "all things which are movable at the time the security interest attaches or which are fixtures \* \* \*, but does not include money, documents, instruments, accounts, chattel paper, general intangibles, contract rights and other things in action."

est in intangibles, and that to perfect the security interest in the reversionary interest in the equipment it was necessary to file a financing statement in New Jersey where the equipment was located. N.J.Stat.Anno. 12A:9–102(1) (1962), 9–302, 9–401(1)(c) (Supp.1972).

Obviously the leased property itself is "goods". We conclude, as did the district court, that the future reversionary interest is likewise an interest in goods, whether it represents "equipment" or "inventory" collateral.[7] The drafters of the Code classified collateral mainly according to the nature or use of the underlying entity, rather than the character of its ownership at any given time. Significantly, the examples of "general intangibles" given in the Official Comment to § 9–106 are all types of property that are inherently intangible. And several Code sections and comments suggest that a collateral interest in "goods" remains such even when the goods are leased. See §§ 9–103(2); 9–109(4) and Official Comment 3; 9–304(3); N.Y. U.C.C. 9–109, Practice Commentary 2 (McKinney 1964) (Kripke).

We conclude accordingly that if the instruments were "true leases", the security interest in the leased equipment was not perfected because of the failure of the Bank to file financing statements in New Jersey.[8]

### Were Lease Instruments "True Leases"?

In view of our holding that under a true lease the filing of a financing statement in New Jersey would be required, the determination of whether the lease instruments were "true leases" or security agreements is critical. If the agreements were true leases, Leasing was the owner of the equipment. If they were disguised security agreements, Plastimetrix was the owner, and the filing and possession of the agreements in New York would protect the security interest of the Bank.

In assuming that the agreements between the lessor and lessee were in fact "true leases" the district court relied upon a provision in a stipulation of the parties that, "At all times relevant hereto the Bankrupt [Leasing] owned the leased equipment, subject to the claims and interests of the Bank thereto and therein as appears from the exhibits[9] attached to the stipulation."

This stipulation was made prior to submission of the petition to the Referee in Bankruptcy and apparently before the parties were aware that the distinction between a true lease and a security device would be crucial to a determination of this case. It may well be, as appellant argues, that the Bank and Trustee had simply agreed that Leasing was the owner of the equipment, "vis-a-vis the Bank [and not vis-a-vis Plastimetrix], subject to the rights of the Bank", and that, "Neither the Bank nor the Trustee knew all of the real, complete, underlying agreements between Leasing and Plastimetrix", necessarily involved in determining the nature of the agreements.

In contending that the record supports the conclusion that the agreements were "true leases", appellee relies upon the lease agreements, stipulation of the par-

---

7. "Equipment" is defined as "goods" which "are used or bought for use primarily in business * * *" (U.C.C. § 9–109(2)) and "inventory" as "goods" which are "held by a person who holds them for sale or lease * * *". U.C.C. § 9–109(4).

8. Appellant alternatively contends that since "Leasing had assigned all of its interest in the machinery and equipment to the Bank" it had preferential rights to the equipment under "the law of bailment leases" regardless of the Code provisions. The assignment of the equipment from Leasing to the Bank, however, was expressly made "as security for any and all obligations of [Leasing] to the Bank under and pursuant to the Loan and Security Agreement * * *." This assignment clearly created a security interest in the Bank and made the requirements of Article 9 applicable to the Bank's interest in the equipment. U.C.C. § 9–102(1)(a).

9. The exhibits consisted of copies of the security agreement, lease instruments, assignments of leases, and financing statements.

ties, and the "assumption" of the district court based upon the stipulation. Appellee then argues that the question of whether the agreements were true leases was first raised on appeal and that the case must be decided on the record now before the court. In its reply brief, however, appellant quotes from the brief it submitted to the district court, reading in part: "If this Court concludes the distinction is determinative, it cannot be determined from the Statement and Supplemental Statement, whether the Plastimetrix leases are leases intended as security devices (hence security agreements) or are true leases." [10]

"Whether a lease is intended as security is to be determined by the facts of each case * * *." U.C.C. § 1-201(37). In making this determination the court may properly consider "factors outside of the lease as well as the contents of the lease itself * * *". In Re Walter Willis, Inc., 313 F.Supp. 1274, 1278 (N.D.Ohio 1970), aff'd, 440 F.2d 995 (6 Cir. 1971).

We conclude that the case should be remanded for a determination by the district court, following an evidentiary hearing, whether the lease instruments were in fact "true leases" or lease devices intended as security.[11]

### Allocation of $60,000

It appears from the opinion of the district court that at the hearing on the Trustee's petition "the parties stipulated that the $60,000 sum, representing all of creditor's [Bank's] 'right, title and interest' in the equipment be awarded intact either to the trustee as lien creditor or to creditor as secured creditor." [12] The court decided to "honor the agreement to keep the sum intact, even though the $60,000 could be construed to represent two property interests distinguishable under Article 9—an interest in the leasehold, perfected by the creditor, and an unperfected interest in the reversion."

Appellant argues in its reply brief that "Leasing had no 'reversionary' interest in the property leased to Plastimetrix" since the present value of the unpaid lease rentals at the time of the sale exceeded $60,000, and the reversionary interest accordingly had no pecuniary value. At oral argument appellee contended that the $60,000 represented the sale price of the equipment itself, and not the leasehold, and since the Bank had not perfected its security interest in the equipment it was not entitled to any part of the fund.

We agree with the district court that the $60,000 could properly be construed to represent the two property interests —the perfected interest in the leasehold and the unperfected interest in the reversion. The stipulation for the sale covered all the "right, title and interest" of both the Bank and the Trustee. The lease agreements provide that upon de-

---

10. The brief continues: "The hallmark of leases intended as security devices is whether the lessee can acquire absolute ownership of the leased property after the end of the lease term by the exercise of an option to purchase the leased property for a nominal amount, or by the lessee's option to renew the lease at a nominal rental. While no options to purchase exist in the leases, each does, by the schedule attached, grant the lessee the option to continue to rent the equipment. The renewal rent is not filled in the blank spaces provided, so that it cannot be determined whether the Bankrupt and Plastimetrix had any side agreement relating to the amount of renewal rent, or intended to leave that matter subject to further negotiation. This can always be shown by parol evidence and the Bank should be granted the opportunity to adduce such evidence if this Court deems Mr. Levie's distinction as to the nature of the leases to be controlling. See In Re Telemax Corp., 10 U.C.C.Rep. Serv. 1316 (S.D.N.Y., Babitt, Ref.)"

11. In view of this conclusion we do not consider further the contentions of the respective parties based on the lease agreements. The effect of the lease provisions, as well as other evidence, should be considered initially by the trial court.

12. The stipulation that the $60,000 sum be awarded intact to one of the parties does not appear in the written record and apparently was made orally in court at the hearing on the petition.

fault the lessor may sell the equipment and that the proceeds, less expenses, will be credited upon unpaid rentals. The security agreement provides for the assignment to the Bank of a continuing security interest in both the leasehold and property leased for loans not to exceed 80% of the aggregate unpaid rentals.

In the event the district court determines upon remand that the agreements were "true leases", it will then be necessary to consider further the effect of the stipulations of the parties [13] and determine whether the $60,000 represents the sale of the leasehold as well as the sale of the reversionary interest in the equipment. If the court decides that the $60,000 represents two separate interests, it must determine the applicability of any stipulation to keep the fund intact and, in the light of that determination, the proper allocation of the fund.

Remanded for further proceedings consistent with this opinion. The court may on remand consider all stipulations of the parties, as well as any other competent evidence, written or oral, in determining the nature of the Plastimetrix leases and the effect of any stipulations the parties may have made.

HAYS, Circuit Judge (dissenting):

I would affirm the determination of the trial court for substantially the reasons given by Judge Weinstein.

---

13. The various stipulations suggest that initially both parties were concerned with the single issue of whether the filing of the financing statements and possession of the leases in New York perfected a security interest in the equipment in New Jersey, without giving due consideration to the other issues subsequently raised, i. e., whether the agreements were "true leases" and whether the $60,000 represents the sale of both the leasehold and reversion.