## In re COMMERCIAL MANAGEMENT SERVICE, INC., Debtor.

## In re FINANCIAL EQUITY SERVICE, INC., Debtor.

**Stephen S. GRAY, Chapter 11 Trustee of Debtor Financial Equity Service, Inc., Plaintiff,**

v.

**JEFFERSON LOAN AND INVESTMENT BANK, Defendant.**

**RHODE ISLAND SHARE AND DEPOSIT INDEMNITY CORPORATION, Defendant and Third–Party Plaintiff,**

v.

**SHAWMUT BANK OF RHODE ISLAND, Third–Party Defendant.**

Bankruptcy Nos. 89–10618–JNG, 89–10620–JNG.

Adv. No. A90–1121–JNG.

United States Bankruptcy Court, D. Massachusetts.

May 17, 1991.

Vincent Pisegna, Looney & Grossman, Boston, Mass., for plaintiff.

Daniel Glosband, Goodwin, Procter & Hoar, Boston, Mass., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

### I. PROCEDURAL HISTORY

On March 10, 1989, Financial Equity Service, Inc. ("FES" or the "Debtor"), filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. FES operated as a debtor-in-possession for approximately eight months. On November 21, 1989, Stephen S. Gray was appointed the Chapter 11 Trustee (the "Trustee") of FES. He initiated the above captioned adversary proceeding by filing a Complaint to Disallow, Subordinate or Otherwise Determine Secured Claim by Jefferson Loan and Investment Bank; for Turnover of Equipment Leases; to Avoid and Recover Fraudulent Transfers; for Breach of Contract and Fiduciary Duty; and Other Claims. On June 5, 1990, Jefferson Loan and Investment Bank ("Jefferson") answered the nine count Complaint. It also filed a Counterclaim and a Third–Party Complaint against

Shawmut Bank of Rhode Island ("Shawmut"). Prior to the filing of Jefferson's Answer, Rhode Island Share and Deposit Indemnity Corp. ("RISDIC"), as the successor in interest to the equipment leases that are the subject of the Trustee's Complaint, filed an Answer. It also filed a Counterclaim and a Third–Party Complaint against People's Bank ("People's"), Shawmut's predecessor-in-interest.

Subsequently, RISDIC moved to withdraw its pleadings. On July 30, 1990, RISDIC filed a Motion to Substitute Rhode Island Share and Indemnity Corporation as Defendant in Counts I, II, IV, V, and VI, Plaintiff–in–Counterclaim and Third–Party Plaintiff. The grounds for the Substitution Motion were that RISDIC, as a Rhode Island non-profit corporation created by statute for the purpose of insuring shares and deposits of financial institutions, exercised its statutory duty to assume control over the assets and operations of the insolvent Jefferson and purchased the subject leases as part of its statutorily imposed obligation to formulate a business plan to guaranty payment to insured depositors. The Court allowed RISDIC's substitution motion on September 24, 1990.[1] The Court had previously allowed a Joint Motion by RISDIC and Jefferson to transfer Jefferson's claim of approximately $4.5 million against FES to RISDIC.

On October 29, 1990, RISDIC filed a Motion for Partial Summary Judgment. Through its motion, it raises a number of issues for determination, including (a) whether RISDIC has a valid perfected security interest in the rental stream under the subject leases assigned by FES to Jefferson (and by Jefferson to RISDIC); and (b) if so, whether RISDIC's security interest in the leases is superior to the blanket security interest of Shawmut and the rights of the Trustee under 11 U.S.C.

§ 544. Specifically, RISDIC seeks dismissal of Count I and II of the Trustee's Complaint, the entry of judgment in its favor on its first and second counterclaims, the entry of judgment in its favor with respect to its Third–Party Complaint, and denial of Shawmut's Third–Party Counterclaim.[2] The Trustee filed a Cross–Motion for Summary Judgment on November 9, 1990. Both RISDIC and the Trustee filed briefs and reply briefs. The Court heard arguments on the cross motions on November 27, 1990.

## II. FACTS

On October 16, 1990, RISDIC and the Trustee filed a Stipulation of Undisputed Facts. From the Stipulation, the following facts emerge.

Beginning in 1986, FES was in the business of equipment leasing. On February 8, 1988, People's (now Shawmut) entered into a Security Agreement and Collateral Assignment of Leases and Rents with FES. People's filed UCC–1 Financing Statements with the appropriate filing offices in conjunction with its $2.3 million loan to FES secured by a security interest in all of FES' receivables, general intangibles, leases, inventory, machinery, equipment and fixtures, then owned or thereafter acquired and the proceeds thereof.

On September 22, 1988, FES, by its president, Michael Lolicata ("Lolicata"), and Jefferson executed a Master Sale and Servicing Agreement (the "Agreement"). Pursuant to the Agreement, FES represented that it was "the owner of, and [had] the right to sell and assign the right to receive, collect and enforce payment of the Leases, free and clear of all security interests, liens, encumbrances, claims or other interests;" and Jefferson represented that it desired "to purchase the payments in respect of the Leases." FES agreed "to re-

---

**1.** Jefferson remains the defendant in Counts VII, VIII, and IX of the Trustee's Complaint since those counts seek affirmative recovery against Jefferson for its alleged breach of contract, breaches of fiduciary duty and negligence.

**2.** The Trustee, through Counts I and II, seeks a determination that Jefferson's claimed security interest in the leases is invalid and unenforceable and that Jefferson be required to transfer and deliver all leases within its control to the Trustee. Through its first two counterclaims, which are also denominated Third–Party claims against Shawmut, RISDIC seeks a determination of the validity and priority of Jefferson's interest in the leases.

purchase any Lease which might go into default or, at its option, exchange such a Lease with one owned by FES of equal or greater value." FES also agreed to provide billing, accounting and collection services with respect to the Leases. The parties stated:

> FES hereby assigns all of its right, title and interest in and to the payments due under the Leases set forth on Exhibit A for an amount payable in cash which is set forth on such Exhibit A; subject however, to the right on the part of FES to retain for its sole and absolute possession, the ownership of the equipment and the rights to any payment in respect thereof by the Lessee thereof (the "Residuals"). In addition to the assignment of the Leases, FES, subject to FES' right to the Residuals, also assigns all of its rights to the monies due under the Leases and all agreements, documents or instruments related thereto or securing performance by the lessees under the Leases.

Two hundred eighty-one leases were physically transferred to Jefferson. However, only 212 of the 281 leases transferred had original signatures in which FES was the named lessor. Sixteen of the 281 leases had original signatures but FES was not the named lessor. The remaining leases were not original documents. Jefferson did not file any Financing Statements with respect to the leases it acquired pursuant to the September 1988 Agreement.

The price of the package or pool of leases sold to Jefferson was calculated by discounting the value of the remaining payments on each lease in the pool. Jefferson paid more than $4.5 million for the leases it purchased.

## III. THE CROSS MOTIONS FOR SUMMARY JUDGMENT

The dispute between the parties involves novel and complex issues for which there is little relevant judicial guidance.[3] Resolution of the dispute turns upon application of the Rhode Island version of the Uniform Commercial Code, R.I. Gen. Laws §§ 6A-1-101 to 6A-9-507, to the facts of the case. In view of the need to integrate numerous sections of the Uniform Commercial Code, the Court will summarize the arguments advanced by both parties.

Chattel paper is defined as "a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods." R.I.Gen.Laws § 6A-9-105(b). RISDIC maintains that each original lease reflects the lease of one or more items of equipment to a named lessee, for a term of months at a fixed monthly payment. Accordingly, RISDIC, citing *Feldman v. First National City Bank (In re Leasing Consultants, Incorporated)*, 486 F.2d 367 (2d Cir.1973), asserts that since the leases themselves evidence both a monetary obligation and a lease of specific goods, they constitute chattel paper. The Trustee does not dispute that the leases themselves are chattel paper. Rather, the Trustee focuses on the fact that Jefferson only purchased the rental payments due under the leases, not all the rights that inured to FES under them.

In the *Leasing Consultants* case, the court considered the issue of the extent to which chattel paper embodied rights in the underlying goods. The court concluded that, if the leases were intended for security, the chattel paper embodied all of the debtor's rights in the underlying collateral because the transaction was fundamentally a sale. However, if the leases were true leases, the debtor had two distinct rights in the underlying equipment: the right to get the equipment back upon default and the right to get the equipment back upon termination of the lease. The court concluded that the debtor's reversionary rights were not embodied in the chattel paper. It stated: "... the leases themselves were chattel papers ... by contrast, the machines

---

3. Indeed, one commentator has said "[c]hattel paper financing is probably the least known major area of secured transaction law." Levie, "Security Interests in Chattel Paper," 78 Yale L.J. 935, 935 (1969) (footnote omitted). Another has noted the "incomplete understanding" of the relation between chattel paper and rights in underlying goods. Jackson, "Embodiment of Rights in Goods and the Concept of Chattel Paper." 50 U.Chi.Law Rev. 1051 (1983).

themselves constituted 'equipment.'" *Id.* at 370. The court emphasized the distinction between rights under the chattel paper and the reversionary interest in the equipment. It quoted Levie, "Security Interests in Chattel Paper," 78 Yale L.J. 935, 940 (1969), as follows:

'the purchaser of a security agreement may have an advantage over the purchaser of a lease. Where [he] purchases equipment leases, he takes only an assignor's interest in the equipment lease itself. If [he] wishes to be secured by an interest in the goods as well, he must obtain a security interest * * * [in the goods] and perfect it.'

486 F.2d at 370–71. The Second Circuit thus articulated a dual perfection rule in the case of true leases. Accordingly, a party claiming a security interest in a lease and the reversion, i.e., the equipment subject to the lease, must perfect both its interest in the lease or chattel paper and the equipment.

RISDIC next argues that although Jefferson and FES structured their transaction as a purchase of some of FES' rights under the leases, instead of as a loan with the leases serving as collateral, the Uniform Commercial Code provides that Jefferson, as an assignee of chattel paper, nevertheless is a "secured party" with a "security interest" in the leases. *See* R.I. Gen. Laws § 6A–1–201 (37) (A security interest includes "any interest of a buyer of accounts, chattel paper, or contract rights...."), § 6A–9–102 (Chapter 9 applies "[t]o any sale of accounts or chattel paper"), and § 6A–9–105(m) (" 'Secured party' means "a lender, seller, or other person in whose favor there is a security interest, including a person to whom accounts, or chattel paper have been sold.") RISDIC maintains that since by definition Jefferson was a secured party, R.I. Gen. Laws § 6A–9–105(m), Jefferson's security interest attached to the original leases without the need to execute a security interest when it took possession of the original leases pursuant to R.I. Gen. Laws § 6A–9–203(1). That section provides:

[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless

(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement ...; and

(b) Value has been given; and

(c) The debtor has rights in the collateral.

*Id.* RISDIC correctly notes that there is no real dispute that the leases were consensually delivered and that Jefferson gave value. However, with respect to 94 of the 228 leases with original signatures, the Trustee asserts that FES did not have "rights in the collateral" because they were either secretly assigned to Shawmut or Commercial Management Service, Inc. ("CMS"), an entity related to FES, prior to their assignment and physical transfer to Jefferson or because CMS accounted for them on their books. In response, RISDIC claims that estoppel created the requisite rights in FES to assign Jefferson a security interest and that the Trustee is estopped from denying that FES had the requisite rights in the original leases. RISDIC cites *Matter of Pubs, Inc. of Champaign,* 618 F.2d 432 (7th Cir.1980), and *Avco Delta Corp. Canada Ltd. v. United States,* 459 F.2d 436 (7th Cir.1972), to support its position. RISDIC also highlights the facts that Lolicata was a director and officer of FES and CMS, and that FES represented through Lolicata that it was the owner of the original leases, that the leases were unencumbered, and that FES had the requisite rights to assign the leases.

RISDIC next maintains that Jefferson perfected its security interest upon taking possession of the leases pursuant to R.I. Gen.Laws § 6A–9–305 ("A security interest in ... chattel paper may be perfected by the secured party's taking possession of the collateral."), and that a written security agreement was not required for either attachment or perfection. *Id.* at § 6A–9–203, comments 3–5. Comment 1 to § 6A–9–305 explains the rationale as follows:

As under the common law of pledge, no filing is required by this Article to perfect a security interest where the se-

cured party has possession of the collateral. Compare Section 9–302(1)(a). This section permits a security interest to be perfected by transfer of possession only when the collateral is goods ... documents or chattel paper: that is to say accounts and general intangibles are excluded.

Pursuant to R.I.Gen.Laws § 6A–9–301(4), which governs the priority between a prior secured creditor and a lien creditor, and R.I.Gen.Laws § 6A–9–308(a), which also addresses priority issues, RISDIC concludes its argument by claiming that the security interest it acquired from Jefferson is superior to the Trustee's rights as a lien creditor and the blanket security interest now held by Shawmut in all FES receivables and general intangibles.

The Trustee, in his Motion for Summary Judgment, argues that Jefferson does not have an interest in chattel paper because, as a result of its purchase of the right to receive rental payments only, its interest is in the rental stream of the leases and not the equipment leases themselves. In other words, the Trustee emphasizes his view that Jefferson merely received an assignment of the rental income from the leases in return for the payment of a purchase price, with FES retaining all of the other rights associated with the leases, including the residual value of the equipment and ownership of the equipment. As a consequence, the Trustee maintains that the right to receive a rental stream under a lease is a general intangible.

The Uniform Commercial Code defines accounts and general intangibles in section 9–106 as follows:

"Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel papers, whether or not it has been earned by performance. "General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money. All rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incidental to the charter or contract are accounts.

R.I.Gen.Laws § 6A–9–106. The Trustee relies upon three cases for the proposition that an assignment of a stream of payments under a lease, a note, or a stock certificate is an interest which is separate and distinct from an assignment of a lease, note or stock itself. *See F.D.I.C. v. W. Hugh Meyer & Associates, Inc.*, 864 F.2d 371 (5th Cir.1989); *In re Southern*, 32 B.R. 761 (Bankr. D. Kansas 1983); *In re Sabre Farms, Inc.*, 27 B.R. 532 (Bankr. D. Oregon 1982).

With respect to R.I. Gen. Laws § 6A–9–203(1) regarding the attachment and enforceability of security interests, the Trustee goes on to argue that Jefferson's claimed security interest in rental income did not attach because there was no "collateral" contemplated by the Master Agreement. (Collateral is defined by R.I.Gen. Laws § 6A–9–105(c) as "the property subject to a security interest, and includes accounts, and chattel paper which have been sold.") Alternatively, the Trustee suggests that to the degree there is any collateral, it is rental income that must be perfected by filing.

With respect to the so-called secret assignments, the Trustee maintains that because the Master Agreement references an Exhibit A which lists the leases that FES represented it owned and because Exhibit A was never produced by RISDIC, it is unclear which leases FES represented it owned and which leases, if any, were actually transferred as of the date of the Master Agreement. The Trustee maintains that the cases cited by RISDIC are distinguishable and that the doctrine of estoppel does not protect a lender who exercises no care with respect to its lending practices.

Finally, with respect to R.I.Gen. Laws § 6A–9–308(a), the Trustee's argument is two-fold: 1) that Jefferson did not purchase chattel paper; and 2) that RISDIC failed to submit by way of affidavits or discovery materials evidence that it had "no knowledge" of the security interest held by People's. The Trustee relies upon *inter alia* the affidavit of Benedetto Ceril-

li, a principal of Jefferson, who in a deposition acknowledged that he was informed by People's that it had a substantial line of credit outstanding with FES prior to the execution of the Master Agreement.

## IV.  DISCUSSION

From the briefs and arguments of the parties, the Court is able to discern three principal issues: 1) whether Jefferson's purchase of the right to receive rental payments under an equipment lease is an interest that can be evidenced and perfected by possession of chattel paper; 2) whether the Trustee is estopped from claiming that FES lacked rights in certain leases (i.e., those that were secretly assigned or in which an entity other than FES is named the lessor); and 3) whether Jefferson had actual knowledge of People's prior perfected security interest.

■ Rhode Island Gen. Laws § 6A–9–105 defines collateral as "the property subject to a security interest, and includes accounts and chattel paper which have been sold." *Id.* The term secured party includes a person to whom chattel paper has been sold, and the term "security interest" is defined to include *"any interest of a buyer ... of chattel paper."* R.I. Gen. Laws § 6A–1–201(37) (emphasis supplied). Comment 4 to § 6A–9–105 informs as follows:

> Under the definition of "security interest" in Section 1–201(37) a lease does not create a security interest unless intended as security. Whether or not the lease itself is a security agreement, it is chattel paper when transferred if it relates to certain goods. Thus, if the dealer enters into a straight lease of the tractor to the farmer (not intended as security), and then arranges to borrow money on the security of the lease, the lease is chattel paper.

*Id.* Clearly, the leases that Jefferson possessed constitute chattel paper. However, as one commentator has noted:

The Code does not specifically provide that the transfer of chattel paper transfers the obligation it represents; nor does it specifically provide that perfection of a security interest in the written paper, for example, by possession, perfects a security interest in those obligations. It merely provides in Section 9–305 that '[a] security interest in chattel paper may be perfected by the secured party's taking possession of the collateral.'

Boss, "Lease Chattel Paper:  Unitary Treatment of a 'Special Kind of Commercial Specialty," 1983 Duke L.J. 69, 92 (1983) (footnotes omitted).

■ Thus, RISDIC only can prevail with respect to the first issue raised by the parties, if it can perfect its interest in the income stream from the leases by possession of the leases.  Although the Code does not specifically provide this,

> [t]aking possession of the collateral, the chattel paper itself, would be meaningless unless the paper represented the underlying rights which were transferred by a transfer of the paper.  Therefore, the necessary implication of Section 9–305 is that delivery of chattel paper operates to transfer the claim that the paper represents....
>
> \*     \*     \*     \*     \*     \*
>
> [S]ection 9–305 bestows on leases an important element of negotiability: a lease is treated as the embodiment of the rights it represents such that these rights are transferred by a transfer of the lease document.[4]

Boss, *supra,* at 92–94 (footnotes omitted).

The Trustee relies on three cases to defeat the logic of the above statutory provisions and establish that the right to payments under the leases is a general intangible.  The Court is not persuaded by the cases cited by the Trustee.

In *F.D.I.C. v. W. Hugh Meyer & Associates, Inc.,* 864 F.2d 371 (5th Cir.1989), the debtor signed an agreement pursuant to which he pledged stock and granted a bank

---

**4.** This interpretation is at odds with non-Uniform Commercial Code law which holds that a true lease document is not the indispensable embodiment of the right to rentals such that transfer of the lease document is necessary to transfer the right to rentals. Boss, *supra,* at 88.

a security interest in stock dividends. The bank, however, did not stop the debtor from receiving dividends on the pledged stock by registering its holding of the pledged stock or by putting a stop transfer order on the stock. Consequently, the debtor was able to pledge dividend shares to a third party. The court held that because possession was essential under Texas law to obtain a secured interest and because the bank never obtained possession of the pledged stock, the bank was not entitled to dividend shares for which a third party had perfected a security interest. The Trustee failed to explain why a case decided under the provisions of Article Eight of the Uniform Commercial Code should be applicable to a case under Article Nine.

In *In re Southern*, 32 B.R. 761 (Bankr.D. Kansas 1983), the debtors held a promissory note from a third party. The debtors purportedly assigned the note and a mortgage granted under an installment land sale contract to a mortgagee bank. The mortgagee bank did not retain possession of the promissory note. In its analysis, the court addressed two alternatives for what was assigned: the note or the right to receive payment under the note. The court held that, if a right to receive payment was assigned, then that right constituted a general intangible that was unperfected since the bank failed to file a financing statement with respect to a general intangible. The court also ruled that, if the note itself was assigned, the bank was unperfected because it failed to obtain possession. The court specifically did not rule on the correctness of either theory.

Finally, the Trustee cites *In re Sabre Farms, Inc.*, 27 B.R. 532, 536 (Bankr.D. Oregon 1982), for the proposition that "[t]he right to receive rent under a lease of land is a general intangible." The court in *Sabre Farms* distinguished between the right to receive rental income under a lease and the entire leasehold interest. The Trustee faces a difficult hurdle analogizing principles concerning interests in land or real estate to equipment leases because, as a general rule, and pursuant to R.I.Gen. Laws § 6A–9–104(j), Article Nine does not apply to real estate interests. The Court is not persuaded that the *Sabre* ruling applies in this case.

Additionally, the Court simply is unable to fathom the Trustee's argument that the right to receive rental payments under a lease is a general intangible in light of the views expressed by commentators. For example, one commentator has stated:

> The drafters theoretically did not need to include true leases in the Code definition of chattel paper but could have included them within the definition of an account. Section 9–106 defines an account as 'any right to payment for goods sold or leased ... which is not evidenced by an instrument or chattel paper.' The right to payment under a lease fits within this definition and is excluded only by the existence of a writing, which usually transforms it into chattel paper.... The explicit exclusion of vessel leases from the definition of chattel paper demonstrates that a lease could easily and properly be treated as an account.

> \* \* \* \* \* \*

> Conceptually and functionally, the assignment of a true lease resembles an account far more than it resembles chattel paper.... The Code treats the transfer of the right to payment under a sales contract as an account, but considers the transfer of the right to payment under a lease to be chattel paper.

Boss, *supra*, at 86–87 (footnotes omitted).

Likewise, another commentator has stated:

> Nothing in the concept of chattel paper calls for an embodiment of the reversionary right while the goods are in the lessee's hands, instead of the debtor's. Chattel paper exists to create the possessory-based advantages of negotiability that come from paperizing an intangible, an account receivable. Nothing ... suggests chattel paper also exists to capture advantages associated with paperizing a right to tangible property such as goods, except insofar as those rights are inherently ancillary to the intangible rights being paperized.

T. Jackson, "Embodiment of Rights in Goods and the Concept of Chattel Paper," 50 U.Ch.L.Rev. 1051, 1077 (1983) (footnotes omitted).

The Trustee also argues that if the assignment of the rental income of a lease without the concomitant assignment of the residual interest constituted an assignment of chattel paper which could be perfected by possession, a third party financier's ability and willingness to lend money against the residuals would be extinguished. This argument is misplaced. In the first place, *Feldman v. First National City Bank (In re Leasing Consultants Incorporated)*, 486 F.2d 367 (2d Cir.1973), suggests that only the prior filing of a financing statement vis a vis the equipment itself would diminish such a right in the case of true leases. Moreover, the proper focus should not be on the debtor's ability to easily obtain additional loans secured by the residual value of the equipment but on the notice of prior security interests available to a third party who might lend money to the debtor on the security of the income stream from the leases. In *In re Funding Systems Asset Management Corp.*, 111 B.R. 500 (Bankr.W.D.Pa.1990), the court, recognizing the relevance of the common law of pledge, explained the rationale that possession be such as to give notice to others as follows:

> The rationale for the requirement of exclusive possession and control of the pledged property by the pledgee is to prevent the pledgor from misleading a potential subsequent lender into believing that he is free to pledge that same property again. . . .

*Id.* at 517 (citations omitted). By obtaining possession of the original leases, Jefferson precluded FES from offering the original leases to another lender as collateral.

Given the plain meaning of the Uniform Commercial Code sections defining security interests, secured parties, collateral, chattel paper, accounts, general intangibles and proceeds, the Court is unconvinced by the Trustee's arguments. RISDIC's argument is not flawless, since the Uniform Commercial Code's unitary treatment of true leases and leases intended for security can gener-ate problematic results. *See* Boss, *supra.* However, the Court is persuaded that the right to receive payments under the leases that FES assigned to Jefferson could be and indeed was evidenced by chattel paper, and thus RISDIC is a secured party with an enforceable security interest in the leases, subject to the reservations set forth below.

Sixty-two of the 212 original FES leases were assigned by FES to either CMS or Shawmut and 89 leases were treated as CMS leases by CMS. (Because of overlap, the figure of 94 has been used by the Trustee for the number of leases in which FES allegedly had no rights.) With respect to these leases, the Court is not persuaded by the Trustee's argument that FES and CMS are not affiliates within the definition of the word adopted by the courts in *Matter of Pubs. Inc. of Champaign*, 618 F.2d 432 (7th Cir.1980) and *Avco Delta Corp. Canada Ltd. v. United States*, 459 F.2d 436 (7th Cir.1972), or by his argument that Jefferson and RISDIC should be precluded from asserting an interest in the leases because of Jefferson's appalling lack of due diligence.

In both *Pubs* and *Avco Delta,* the issue before the court was whether the debtor had "rights in the collateral" so that the security interest claimed by the purported secured party would attach and became enforceable even though the debtor did not own the collateral. Since the Uniform Commercial Code does not displace principles of law and equity, including the law relative to estoppel, unless specifically so stated in a particular provision, the courts in these two Illinois cases looked to the law of estoppel developed by the state courts. The court in *Pubs* summarized the relevant law as follows:

> Under Illinois law one may be estopped from asserting his rights if his words or conduct has led another party to take some action which he would not otherwise have taken but for the words or conduct of the estopped party. The party asserting the estoppel in such a case must have actually relied on the words or conduct and may not have had knowl-

edge of (or convenient access to) facts contrary to those on which he relied. A party may also be estopped from asserting his rights where he has merely been silent but

> 'where silence is the ground of the estoppel it is essential that the party estopped should have knowledge of the facts *and the other party be ignorant of the truth* and be misled into doing that which he would not have done except for that silence.'

If the president, vice-president or director of a corporation has knowledge or notice of a fact, knowledge or notice of that fact is generally imputed to the corporation. Notice to the director of a corporation is notice to the corporation and estops the corporation and its receiver from questioning the validity of a prior transaction. Parties to an agreement are also estopped to deny the recitals contained in the agreement.

*Pubs,* 618 F.2d at 438 (citations omitted). The Rhode Island Supreme Court in *Lutz Engineering Co., Inc. v. Industrial Louvers, Inc.,* — R.I. —, 585 A.2d 631 (1991), expressed similar precepts relative to the law of estoppel. It indicated that for estoppel to apply there needs to be an affirmative representation or equivalent conduct by the party against whom the estoppel is to be applied; representations made for the purpose of inducing the other party to act or fail to act in reliance on the representations; and reliance on the representations. The Rhode Island courts have also applied the law of estoppel when a party has remained silent despite a duty to speak. *See Schiavulli v. School Committee of Town of North Providence,* 114 R.I. 443, 334 A.2d 416 (1975); *Martines v. Terminal Methods, Inc.,* 101 R.I. 599, 225 A.2d 790 (1967).

[redacted] It is undisputed that Lolicata was a director, officer, and 50% shareholder of both FES and CMS. Consequently, FES and CMS are affiliates as that term is defined in the Bankruptcy Code.[5] Indeed, the Court notes that both the Trustee in Answers to interrogatories and the Examiner in her deposition have commented upon Lolicata's control over FES and CMS and his use of the two corporations for one economic purpose. Accordingly, the Court finds that the Trustee is estopped from denying that FES had the requisite right to assign Jefferson a security interest in the original leases in which FES is the named lessor. Moreover, the Court is not troubled by RISDIC's failure to produce Exhibit A to the Agreement. Clearly, the Agreement contemplated the replacement of leases, if necessary, and FES' representations can easily be construed to be prospective with respect to future leases.

[redacted] However, even assuming the existence of valid secret assignments to CMS, because Jefferson perfected its security interest by possession and CMS did not perfect any interest either by possession or filing, RISDIC would prevail over CMS. *See* R.I.Gen.Laws § 6A–9–312(5)(a). Likewise, pursuant to 11 U.S.C. § 544, RISDIC would prevail over the Trustee in his role as a hypothetical lien creditor of both FES and CMS. *See* R.I.Gen.Laws § 6A–9–301(4). With respect to the 16 leases in which a party other than FES is the named lessor, the Court will schedule an evidentiary hearing to establish what, if any, rights FES had in that collateral.

[redacted] The final issue before the Court concerns R.I.Gen.Laws § 6A–9–308 and whether the interest of Jefferson (and thus RISDIC) is superior to that of Shawmut by virtue of Jefferson's possession of the leases. Section 6A–9–308 provides in relevant part:

> A purchaser of chattel paper ... who gives new value and takes possession of it in the ordinary course of his business

5. Section 101(2)(B) of the Bankruptcy Code defines affiliate in relevant part as follows:

> [a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor....

11 U.S.C. § 101(2)(B).

has priority over a security interest in the chattel paper ...

(a) Which is perfected under § 6A–9–304 (permissive filing and temporary perfection) or under § 6A–9–306 (perfection as to proceeds) if he acts *without knowledge* that the specific paper ... is subject to a security interest....

*Id.* (emphasis supplied).

It is incumbent upon RISDIC to establish that Jefferson had no knowledge that the leases were subject to People's blanket security interest. Under the Uniform Commercial Code, the term knowledge means actual knowledge, R.I.Gen.Laws § 6A–1–201(25), rather than notice which is defined as follows:

A person has "notice" of a fact when (a) He has actual knowledge of it; or (b) He has received a notice or notification of it; or (c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists.

*Id.* RISDIC argues that there is no evidence suggesting that Jefferson had knowledge that the original leases were subject to a prior security interest. As has been stated, the Trustee, in response, notes that RISDIC submitted no affidavits or discovery materials demonstrating that Jefferson had "no knowledge" of the blanket security interest. Additionally, the Trustee points to the deposition of Benedetto Cerilli who acknowledged that he spoke with an agent of People's and was informed that it had a substantial line of credit outstanding with FES and who admitted seeing FES' financial statements that, if inspected closely, would have revealed, that the People's loan was secured by leases. Moreover, Jefferson's president Steven Salvatore testified at his deposition that he was informed that People's and FES had done business together that involved providing "some type of credit lines for the leases." He also testified that Lolicata informed him that the line of credit secured by the leases would be paid down from proceeds of the transaction with Jefferson. In view of the conflicting inferences that can be drawn from the testimony with respect to the issue of actual knowledge, the Court cannot find that there are no material facts in dispute to warrant summary judgment. Clearly, the credibility of Salvatore and Cerilli must be assessed by the Court before any decision can be reached with respect to this issue.

## V. CONCLUSION

In view of the foregoing, the Court hereby allows RISDIC's Motion for Summary Judgment in part and denies it in part and denies the Trustee's Motion for Summary Judgment.