In re COMMERCIAL MONEY CENTER, INC. Debtor.

NetBank, FSB, Appellant,

v.

Richard M. Kipperman, Chapter 7 Trustee, Appellee.

BAP No. SC–05–1238–MoTB.
Bankruptcy No. 02–09721–H7.
Adversary No. 03–90331–H7.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued on March 23, 2006 at Pasadena, California.

Submitted on May 4, 2006.

Filed—Aug. 2, 2006.

Amended—Aug. 25, 2006 [1].

**1.** After our initial opinion was filed on August 2, 2006, Appellee filed a timely motion for limited rehearing. Appellant filed a response, Appellee filed a reply, and we issue this amended opinion to clarify the points raised by the parties. In all other respects we have denied the motion for limited rehearing by a separate order.

John W. Cutchin, Solomon, Grindle, Silverman & Spinella, San Diego, CA, Bradley S. Shraiberg, Furr & Cohen P.A., Boca Raton, FL, for debtor.

Before: MONTALI, TCHAIKOVSKY,[2] and BRANDT, Bankruptcy Judges.

### AMENDED OPINION

MONTALI, Bankruptcy Judge.

The principal issue in this case appears to be one of first impression for us or any court of appeals. We are told that the multi-billion dollar securitization industry depends on being able to fractionalize financial assets, and specifically on stripping payment streams from underlying transactions such as the equipment leases in this case. The issue is whether those payment streams are chattel paper or payment intangibles. On cross-motions for partial summary judgment the bankruptcy court held that the payment streams are chattel paper. We disagree. The underlying equipment leases are chattel paper but the payment streams stripped from the leases are payment intangibles.

This means that the assignment of the payment streams could be automatically perfected under Revised Uniform Commercial Code ("UCC") Article 9, Section 9–309(3), but only if the assignment is a sale. We agree with the bankruptcy court that the transactions in this case are loans, not sales, so there is no automatic perfection. However, there are unresolved factual and legal issues as to whether perfection was accomplished by taking possession of the underlying leases through a third party agent.

Accordingly, we AFFIRM IN PART, REVERSE IN PART, AND REMAND.

### I. FACTS

Commercial Money Center, Inc. ("Debtor") leased equipment to lessees with subprime credit. It packaged groups of leases together and assigned its contractual rights to future lease payments to entities such as Net.Bank, Inc., FSB ("NetBank").[3] To enhance the marketability of these payment streams Debtor obtained surety bonds guaranteeing the payments and it assigned its rights under the surety bonds to NetBank. As security for NetBank's receipt of the lease payments and any surety bond payments, Debtor granted NetBank a security interest in the underlying leases and other property. In other words, Debtor assigned NetBank both an interest in the payment streams and an interest in the underlying leases, but it separated the two interests.

#### A. Transaction terms

In 1999 and 2000 NetBank transferred over $47 million to Debtor in transactions involving 17 pools of leases. Seven lease pools remain at issue. Each transaction involved (1) a Sale and Servicing Agreement ("SSA") among NetBank, Debtor, and a surety company ("Surety"), (2) surety bonds issued by Surety to Debtor, which Debtor assigned to NetBank under the SSA and was supposed to deliver to NetBank, and (3) an indemnity agreement between Surety and Debtor. A typical lease involved 62 payments of which two

**2.** Hon. Leslie J. Tchaikovsky, Bankruptcy Judge for the Northern District of California, sitting by designation.

**3.** Appellant is identified as Net.Bank in some transaction documents and as NetBank in the pleadings and briefs.

had been paid at the inception, leaving 60 payments assigned by Debtor to NetBank. Debtor paid Surety a premium equal to approximately two percent of the total of all payments due under each lease.

A representative SSA in the excerpts of record states in one part (§ 2.1(c)) that Debtor and NetBank intend a sale, not a loan:

> (c) The execution and delivery of this Agreement shall constitute an acknowledgment by each of [Debtor as] Seller and [NetBank as] Purchaser that they intend that each assignment and transfer herein contemplated *constitute a sale and assignment outright, and not for security,* of the [Transferred Assets, defined in Section 2.1(a) to include the payment streams due or on deposit, the surety bonds, and proceeds of those things], conveying good title thereto free and clear of any Liens, from [Debtor] to [NetBank], *and that all such property shall not be part of the estate of [Debtor] in the event of bankruptcy* .... In the event that such conveyance is determined to be made as security for a loan made by [NetBank] to [Debtor], [Debtor] hereby grants to [NetBank] a first priority security interest in all of [Debtor's] right, title and interest in and to the [Transferred Assets] .... [Emphasis added.]

On the other hand, Section 2.10 of the SSA characterizes the transaction as a loan, not a sale, for tax purposes:

> SECTION 2.10 *Income Tax Characterization.* This Agreement has been structured with the intention that the [amounts payable to NetBank] will qualify under applicable federal, state, local and foreign tax law as *indebtedness* of [Debtor] secured by the Leases and other assets described in Section 2.1. The parties hereto agree to treat and to take no action inconsistent with the treatment of [such amounts] as such indebtedness for purposes of federal, state, local and foreign income or franchise taxes and any other tax imposed on or measured by income. [Emphasis added.]

Other provisions of the SSA also use both sale and loan terminology. The sample SSA provides for NetBank to wire an "Original Principal Amount" of $11,610,558.80 to Debtor "[a]s the purchase price," "being the Present Value of the payment stream discounted to effect Interest Rate yield" applying an "Interest Rate" of 12% per annum (later amended to 11.2287% per annum). SSA §§ 1.1, 2.7(d), Amendment I. In exchange Debtor assigns the Transferred Assets to NetBank "without recourse" and Debtor "shall have no interest in [the] Lease Assets which it may be permitted to sell, pledge, assign or transfer to any Person." SSA §§ 2.1(a), 6.4(c).

Debtor was required to perfect its own security interests in the leased equipment. SSA § 2.1(b). It was also supposed to list NetBank in financing statements and lease documents as the "assignee" of those security interests (SSA § 10.2(a)), stamp the original lease documents with an "appropriate legend ... indicating [NetBank's] ownership interest and security interest in the Lease and Transferred Assets" (SSA § 10.2(e)), and deliver to NetBank (A) evidence of the filing of financing statements, (B) a letter from Surety "acknowledging the valid issuance and delivery of the Surety Bonds," and (C) "the original of each executed Surety Bond with Power of Attorney and Notary attached ...." SSA § 2.7(g). Debtor's Chapter 7 trustee, Richard M. Kipperman ("Trustee"), alleges that in fact Debtor did not fulfill all of these obligations and NetBank's interests were never perfected.

The SSA appoints Surety as "Servicer" of the leases and Debtor as "Sub–Servicer" to assume all responsibilities and perform all duties of the Servicer. SSA §§ 3.7, 7.4, Art. VIII. Despite the extensive financial and other obligations of the Servicer and Sub–Servicer, further described below, NetBank has "no obligation to pay any Servicing Fee." SSA Art. V.[4]

Duties of the Servicer/Sub–Servicer include paying all taxes and insurance on the leased equipment (SSA § 3.4), collecting the payment streams from the lessees (SSA § 3.2), and holding the leases and associated files on NetBank's behalf. SSA § 2.7(a) (at closing Debtor must deliver the original "Lease Files" to Surety as Servicer "which shall then deliver the original Lease Files [back to Debtor] as Sub–Servicer"). Surety/Debtor have the option to commence legal proceedings to enforce the leases "at [their] own expense" (SSA § 3.1), but regardless of the amounts collected they must pay a fixed "Monthly Base Distribution Amount," which is $258,270.47 in the sample SSA, plus other sums including an initial payment of "Interest" and a final payment of any remaining "Principal Balance" and "Interest." SSA §§ 1.1, 3.7, 4.7(a). They are permitted to grant some extensions to lessees but "in no event shall such extension change the Monthly Base Distribution Amount [$258,270.47] to be received by [Net-Bank]." SSA § 1.1, 3.2(c)(iii). If a lessee falls behind then Surety/Debtor shall "as [their] first recourse … realize upon and collect the proceeds in respect of the Surety Bond" (SSA §§ 3.1, 3.3), but if Surety/Debtor wish to avoid whatever costs and consequences would flow from that choice,

they can elect to make a "Servicer Advance" to NetBank to cover the shortfall. SSA § 4.6. When all "Principal" and "Interest" payments have been made Section 2.8 of the SSA provides for any residual Transferred Assets to be transferred back to Debtor:

> *Termination of this Agreement.* This agreement shall terminate upon the receipt by [NetBank] of the Original *Principal* Amount plus all *Interest* Distributable Amounts [i.e., any remaining unpaid monthly "interest" payments, equal to one-twelfth of the product of the Interest Rate and the Principal Balance of all outstanding Leases] and, if the Monthly Total Distribution Amount is not paid in full on the Stated Maturity Date, *interest* accrued at the Interest Rate on such unpaid portion from and after the Stated Maturity Date. Upon such termination, [Surety/Debtor] shall be entitled to any amounts payable to it as provided herein. *Any remaining Transferred Assets shall thence be conveyed to [Debtor] without recourse.* [Emphasis added.]

A sample indemnity agreement between Debtor and Surety, included in the excerpts of record, obligates Debtor and its principals to indemnify Surety and hold it harmless "against all demands, claims, loss, costs, damages, expenses and attorneys' fees whatever, and any and all liability therefore, sustained or incurred by the Surety" under any surety bonds. NetBank is not a party to the indemnity agreement or the bonds.

Section 10.3 of the SSA provides: "*Governing law.* This agreement shall be

---

4. Under the SSA, Debtor theoretically could have been replaced as Sub–Servicer, if a new Sub–Servicer were willing to take on its obligations and if NetBank consented. Unless and until that event, however, NetBank agrees to deal "directly" with Debtor as Sub-

Servicer rather than dealing with Surety as Servicer. SSA § 3.7. Although Debtor eventually resigned as Sub–Servicer, there is no evidence in the excerpts of record that a replacement was selected and served in that capacity.

governed by and construed in accordance with the laws of the state of Nevada without regard to the principles of conflicts of laws thereof and the obligations, rights and remedies of the parties under this agreement shall be determined in accordance with such laws." (Original entirely in capital letters.)

## B. *Procedural background*

The initial Surety, Amwest Surety Insurance Company ("Amwest"), was replaced by Royal Indemnity Company ("Royal"). In early 2002 Royal commenced an action in federal district court to remove Debtor as Sub–Servicer under the SSA (*Royal Insurance Co. v. Commercial Money Ctr., Inc.*, 02–CV–0199–BTM (AJB, S.D.Cal.), transferred for pretrial purposes to Ohio, 02–CV–16002–KMO (N.D.Ohio)).

As stated above, SSA § 2.7(a) contemplated that at closing Debtor would retain the leases as Sub–Servicer. Pursuant to a stipulated order Debtor resigned as Sub–Servicer and Royal was authorized to take possession of the leases in March of 2002 (the "Royal Possession Order"). According to NetBank, it is not clear whether the leases were removed from Debtor's possession at an earlier date, perhaps pursuant to a temporary restraining order entered on February 1, 2002 (the "Royal TRO").

On May 30, 2002 (the "Petition Date") Debtor filed its voluntary Chapter 11 petition (Case No. 02–24068–BKC–RBR, Bankr.S.D. Fla., transferred Oct. 3, 2002, Case No. 02–09721–H7, Bankr.S.D. Cal.). After Debtor's case was converted to Chapter 7, Trustee was appointed and filed an adversary proceeding against NetBank (Adv. No. 03–90331–H7). Trustee initially negotiated a settlement with NetBank but Royal objected to the settlement and as an alternative offered its own settlement with Trustee which was ultimately approved by the bankruptcy court.

Trustee's Complaint seeks declaratory relief and avoidance of NetBank's interests under a combination of the UCC and the Bankruptcy Code. Trustee claims that NetBank has not satisfied the requirements for perfection of its interests in the payment streams and therefore its interests are avoidable using his strongarm powers. *See* 11 U.S.C. §§ 544(a), 550 and 551. The Complaint also seeks a judgment avoiding as a preference any perfection of NetBank's interests in the Transferred Assets that might have occurred within 90 days of the Petition Date. *See* 11 U.S.C. § 547 (as enacted prior to any amendments by The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, 119 Stat. 23, because this case was filed before its effective date). This preference claim anticipates NetBank's assertion that it obtained actual or constructive possession of the leases through the Royal Possession Order, which was issued within the 90 day preference period. *See* 11 U.S.C. § 547(b)(4)(A).

NetBank's Answer alleges (1) "that Royal had actual and constructive possession before and after the [Royal Possession Order]" which "led to [NetBank] being perfected with respect to [the Transferred Assets]," (2) more generally, that "agents and/or bailees always had possession of the items in which [NetBank] is secured," (3) that "while [NetBank] did not file a UCC–1 [financing statement] ... to the extent required, [Debtor and/or Surety] were legally responsible for such filings," and (4) that any transfers that might otherwise be avoidable as preferences were protected by the ordinary course of business defense of 11 U.S.C. § 547(c)(2). The Answer asserts numerous other affirmative defenses including equitable estoppel because Debt-

or and/or Surety "were responsible for, among other things, transferring the sold assets, and perfecting and protecting [Net-Bank's] secured rights and interests under the [SSAs] and under the surety bonds."

NetBank and Trustee filed cross-motions for partial summary judgment. After a hearing on December 20, 2004, the bankruptcy court issued a memorandum decision that Trustee is entitled to judgment on each of the claims described above. *In re Commercial Money Center, Inc.,* 2005 WL 1365055, 56 UCC Rep. Serv.2d 54 (Bankr.S.D.Cal.2005). It ruled that the payment streams constitute "chattel paper" and therefore NetBank was required to perfect its interests under the rules applicable to chattel paper. In the alternative, the bankruptcy court ruled that, even if the payment streams are not chattel paper, NetBank cannot benefit from the automatic perfection rule applicable to sales of payment intangibles (Rev. UCC § 9–309(3)) because the transactions at issue were loans rather than sales. The bankruptcy court's decision states, "It is undisputed" that NetBank did not perfect its interests in the payment streams either by filing financing statements or by taking possession of the underlying leases.

Pursuant to the parties' stipulation the bankruptcy court entered an amended partial judgment for Trustee (the "Judgment") under Fed.R.Civ.P. 54(b) (incorporated by Fed. R. Bankr.P. 7054). Net-Bank filed a timely notice of appeal.[5] In response to questions from the panel at oral argument and in accordance with our orders, the parties have submitted supplemental post-argument letter briefs, and the submission of this appeal was deferred until the last of those letter briefs was received.

## II. ISSUES

A. Are the payment streams "chattel paper" within the meaning of Revised UCC Article 9?

B. Alternatively, were the transactions at issue loans, rather than sales?

C. If the answer to either question is affirmative, is there a genuine issue of material fact whether NetBank perfected its interests in the payment streams, or regarding NetBank's alleged equitable defenses?

## III. STANDARDS OF REVIEW

We review the bankruptcy court's conclusions of law de novo. *In re Woodson Co.,* 813 F.2d 266, 270 (9th Cir. 1986). If findings of fact were properly made in this summary judgment context, we review them for clear error. *Id.*

As a general matter, "[f]indings of fact should be eschewed in determining whether summary judgment should be granted." *Taybron v. City & County of San Francisco,* 341 F.3d 957, 959 n. 2 (9th Cir.2003). Nevertheless, there is an exception for determining "ultimate facts" in non-jury cases when there is no genuine dispute as to the basic facts. In those circumstances the appellate court can treat the appeal as arising from a bench trial with factual findings reviewed for clear

---

5. In considering whether we have jurisdiction we have retrieved from the bankruptcy court's online docket an order entered on April 26, 2005. We are persuaded that this order and the Judgment together satisfy the strict requirements of Fed.R.Civ.P. 54(b). *See generally In re Belli,* 268 B.R. 851, 855 (9th Cir. BAP 2001) (emphasizing that Fed. R.Civ.P. 54(b) certification requires "express" determination that there is no just reason for delay and "express" direction for the entry of judgment on fewer than all claims). Alternatively, on October 5, 2005, a BAP motions panel issued an order that to the extent this appeal is interlocutory "leave to appeal is GRANTED under 28 U.S.C. § 158(a)(3)."

error. *Wolfe v. United States*, 798 F.2d 1241, 1243–44 n. 2, *amended by* 806 F.2d 1410 (9th Cir.1986); *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676, 684 (9th Cir.1990). *See generally* William W. Schwarzer et al., *Cal. Practice Guide: Fed. Civ. Proc. Before Trial,* ¶¶ 14:224–239 at pp. 14–61 through 14–64 (The Rutter Group 2005). The Ninth Circuit appears to have applied this exception in *Woodson*, because it reviewed findings of fact for clear error on an appeal from a summary judgment regarding the distinction between loans and sales. *Woodson,* 813 F.2d at 270, 272. As described below, some basic facts are disputed in this case and others are not.

■ Therefore, when the basic facts are undisputed we review the ultimate findings of fact for clear error. On the other hand, when the basic facts are disputed we cannot treat the ultimate facts as having been decided by a bench trial, and on these cross-motions for partial summary judgment we must reverse and remand if the disputed facts are material and the disputes are genuine. *See generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■■ We review de novo the bankruptcy court's exclusion of declarations reflecting the parties' subjective intent on the loan versus sale issue under the parol evidence rule. That rule is "an issue of state law" reviewed de novo and not actually a rule of evidence. *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 998–99 (9th Cir.2001).

■ The parties disagree on the standard of review applicable to the bankruptcy court's decision on the loan versus sale issue itself. That is a factual determination that we review for clear error, not a mixed question of law and fact as NetBank argues. *See Woodson,* 813 F.2d at 270, 272; *In re Golden Plan of Cal., Inc.*, 829 F.2d 705, 709 (9th Cir.1987); *In re Lendvest Mortg., Inc.*, 119 B.R. 199, 200 (9th Cir. BAP 1990).

Alternatively, our decision on the loan versus sale issue would be the same even if that is a mixed question of law and fact in the circumstances of this case, meaning that the less deferential de novo standard of review applied. For the reasons discussed below, we agree with the bankruptcy court's finding that the transactions at issue were loans rather than sales.

## IV. DISCUSSION

■ Trustee's strongarm powers generally enable him to avoid a pre-petition unperfected transfer by Debtor of an interest in its property. 11 U.S.C. § 544. *See In re Jenson,* 980 F.2d 1254, 1258–59 and 1261 (9th Cir.1992) (majority and concurring opinions discussing avoidance of unperfected security interest under Nevada law and 11 U.S.C. §§ 544 and 547). Trustee argues that NetBank's interests were not perfected.

The parties agree that Nevada's version of Revised UCC Article 9 states the applicable law of perfection. There are no material differences between the Nevada version and the uniform versions of the relevant provisions.[6]

**6.** Trustee's memorandum of points and authorities, filed with the bankruptcy court on June 18, 2004, notes that under Revised UCC § 9–301(2) when perfection is by possession the law that generally governs is the law of the place where the collateral is located. Allegedly that location is California. Neverthe-

less, Trustee concedes that he does not believe there are any material differences between California and Nevada law on this issue. We express no opinion whether the choice of law provisions of the SSAs would require application of Nevada law if there were any material differences on this issue.

■ Like other courts we recognize the usefulness of the Official Comments in interpreting the UCC. *See, e.g., In re Filtercorp., Inc.,* 163 F.3d 570, 580 (9th Cir. 1998). We also recognize that some of the decisions cited below predate Revised UCC Article 9, but they are still useful on the issues discussed.

■ The perfection rules of Revised UCC Article 9 apply not just to security interests for *loans* but also to *sales* of chattel paper and payment intangibles. Nev.Rev.Stat. § 104.9109(1)(c) (with inapplicable exceptions, "this article applies to ... (c) a *sale* of accounts, chattel paper, payment intangibles, or promissory notes") (emphasis added). Somewhat confusingly, the UCC uses lending terminology in provisions that are applicable to sales. *See* Nev.Rev.Stat. § 104.1201(2)(ii) (" 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. 'Security interest' includes any interest of a consignor and a *buyer* of accounts, *chattel paper, a payment intangible* or a promissory note in a transaction that is subject to Article 9.") (emphasis added). *See also* Rev. UCC § 9–109, Official Comment 5 ("Use of terminology such as 'security interest,' 'debtor,' and 'collateral' is merely a drafting convention adopted to reach [the] end [of applying 'this Article's perfection and priority rules' to sales transactions], and its use has no relevance to distinguishing sales from other transactions. *See* PEB [Permanent Editorial Board] Commentary No. 14.").

■ Most perfection is not automatic. One exception is a sale of payment intangibles (referred to as a security interest), which is perfected automatically: "The fol-

lowing *security interests* are perfected when they attach: ... 3. a *sale* of a payment intangible[.]" Nev.Rev.Stat. § 104.9309(3) (emphasis added).

NetBank claims that its transactions with Debtor come within this exception and are automatically perfected. NetBank argues in the alternative that its interests were perfected by possession of the chattel paper or perhaps by filed financing statements. *See* Nev.Rev.Stat. §§ 104.9310(1) (filed financing statement generally required for perfection), 104.9312(1) (chattel paper, perfection by filing), 104.9313(1) (tangible chattel paper, perfection by possession).

### A. *The payment streams are payment intangibles, not chattel paper*

■ NetBank claims that the payment streams are payment intangibles, which is one of the requirements for automatic perfection under Nev.Rev.Stat. § 104.9309(3)—the other principal requirement is that the transactions be sales, which we address in the next section of this discussion. The bankruptcy court held that the payment streams are chattel paper.

The UCC distinguishes between the monetary obligation *evidenced* by chattel paper and the chattel paper itself:

1. In this article:

\*    \*    \*    \*    \*    \*

(k) "Chattel paper" means a *record or records* that *evidence* both a monetary obligation and a security interest in or a lease of specific goods .... As used in this paragraph, "monetary obligation" means a monetary obligation secured by

---

Nevada's version of the UCC is numbered differently from the uniform version. Nevada's amendments last year made more numbering changes but are otherwise immaterial,

and in any event they "do not apply to a right of action that has accrued before October 1, 2005." 2005 Nevada Laws Ch. 233 ("S.B. 201").

the goods or owed under a lease of the goods .... [Emphasis added.]

Nev.Rev.Stat. § 104.9102(1)(k) (emphasis added).

This language on its face defines chattel paper to mean the "records" that "evidence" certain things, including monetary obligations. Payment streams stripped from the underlying leases are not records that evidence monetary obligations—they *are* monetary obligations. Therefore, we agree with NetBank that the payment streams are not chattel paper.

If they are not chattel paper, what are they? Most monetary obligations are "accounts" but the definition of account excludes "rights to payment evidenced by chattel paper." Therefore the monetary obligations in this case fall within the payment intangible subset of the catch-all definition of general intangibles. *See* Nev. Rev.Stat. §§ 104.9102(1)(b) ("Account" means "a right to payment of a monetary obligation ... for property that has been or is to be ... leased ... [but the term] does not include rights to payment evidenced by chattel paper ..."); 104.9102(1)(pp) ("General intangible" means any personal property other than accounts, chattel paper, and various other specified types of property, and specifically "includes payment intangibles"); [7] 104.9102(1)(iii) (redesignated as (hhh) by S.B. 201) ("Payment intangible" means "a general intangible under which the account debtor's principal obligation is a monetary obligation"). *See generally In re Wiersma,* 324 B.R. 92, 106–07 (9th Cir. BAP 2005) (discussing why definition of payment intangible includes assignment of payment right under settlement agreement).

As stated by one publication, the "carved-out payment streams seem to fit the definition of 'payment intangible' like a glove." Barkley Clark and Barbara Clark, *The Law of Secured Transactions Under the UCC,* ¶ 10.08[8][D]. That publication specifically disagrees with the bankruptcy court's decision in this case that the payment streams are chattel paper. *See id.* (criticizing *Commercial Money Center,* 2005 WL 1365055, 56 UCC Rep.Serv.2d 54).

■ Our analysis might stop here. As the bankruptcy court noted, the plain language of the statute is usually conclusive. *See Roger Falcke and Herbig Props. Ltd. v. County of Douglas,* 116 Nev. 583, 588, 3 P.3d 661, 664 (2000) ("Where the language of a statute is plain and unambiguous ... there is no room for construction, and the courts are not permitted to search for its meaning beyond the statute itself" and "words in a statute should be given their plain meaning unless this violates the spirit of the act") (citations omitted). *See also United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (plain meaning legislation should be conclusive, "except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'") (citation omitted). *Cf. In re Kane,* 336 B.R. 477, 487–88 and n. 19 (Bankr.D.Nev.2006) (discussing plain meaning rule, while also noting that "the Supreme Court has not given unambiguous instructions on how to detect or treat legislative ambiguity").

Nevertheless, the bankruptcy court interpreted the plain words of the statute in a manner with which we do not agree:

---

7. We recognize that the definition of general intangibles excludes chattel paper, but because the monetary obligations are not chattel paper they are not excluded from the definition of general intangibles.

The definition [of chattel paper] states three requirements before collateral is characterized as chattel paper: 1) a record; 2) that evidences both a monetary obligation; and 3) a security in or a lease of specific goods. A monetary obligation is defined as a monetary obligation secured by the goods or owed under a lease of the goods. The parties do not dispute that all three elements for chattel paper are met with respect to the underlying equipment leases, but NetBank seeks to characterize the "monetary obligation" owed under the lease as a "payment intangible." This proposition does not follow from the plain language of the statutory definition of chattel paper and *such a reading would essentially delete the monetary obligation requirement from the definition. See* Singer, *Sutherland Statutes and Statutory Construction,* § 47.79 (6th ed. 2000) (A canon of statutory construction is that a definition which declares what a term "means" excludes any meaning that is not stated). The court finds that the monetary obligation (i.e., the payment streams) constitute chattel paper. [Emphasis added.]

■ We do not understand how Net-Bank's reading "would essentially delete the monetary obligation requirement from the definition" of chattel paper. That requirement simply describes the *type* of records involved—they must be records that "evidence" a monetary obligation, among other characteristics. Nev.Rev. Stat. § 104.9102(1)(k). The leases do that, so they are chattel paper, but the payment streams do not. As stated above, they are not "records" that "evidence" monetary obligations, they *are* the monetary obligations.

The bankruptcy court's memorandum decision also comments, in a footnote, that "The Court views NetBank's argument that [Debtor] transferred only the payment streams, and not the underlying leases, immaterial to the legal issue involved." We disagree, for the reasons just stated.

■ As an alternative basis for its ruling, the bankruptcy court considered the policies behind the statute. We agree with the bankruptcy court that the UCC aims to provide certainty in financial transactions and some means for third parties to discover competing interests in property, at least when that property is collateral or some types of purchased property. We are not persuaded that the plain meaning of the statute conflicts with such policies, or alternatively that it is our role to rewrite the statute if there is any such conflict.

The principal decision cited by the bankruptcy court involved an assignee ("Jefferson") that had been assigned only the payment streams and not the underlying equipment leases. *In re Commercial Management Svc., Inc.,* 127 B.R. 296 (Bankr.D.Mass.1991). A critical difference is that Jefferson had also taken possession of the leases. *Id.* at 299. Here the possession of the leases is a disputed issue.

The Chapter 7 trustee in that case argued that the payment streams were general intangibles and that Jefferson had not perfected its interest in those payment streams because it had not filed any financing statements. The *Commercial Management* court rejected this argument, holding that "Jefferson perfected its security interest [in the payment streams] by possession" of the leases. *Id.* at 305. The *Commercial Management* court acknowledged that the UCC does not "specifically provide" for this result:

> The [UCC] does not specifically provide that the transfer of chattel paper transfers the obligation it represents; nor does it specifically provide that perfection of a security interest in the written

paper, for example, by possession, perfects a security interest in those obligations. It merely provides in Section 9–305 that "[a] security interest in chattel paper may be perfected by the secured party's taking possession of the collateral."

*Commercial Management*, 127 B.R. at 302 (*quoting* Boss, "Lease Chattel Paper: Unitary Treatment of a 'Special Kind of Commercial Specialty,'" 1983 Duke L.J. 69, 92 (1983) (footnotes omitted)).

Nevertheless,

[t]aking possession of the collateral, the chattel paper itself, would be meaningless unless the paper represented the underlying rights which were transferred by a transfer of the paper. Therefore, the necessary implication of [former UCC] Section 9–305 [permitting perfection by possession] is that delivery of chattel paper operates to transfer the claim that the paper represents . . . .

*Commercial Management*, 127 B.R. at 302 (*quoting* Boss, 1983 Duke L.J. at 92–93 (footnotes omitted)).

*Commercial Management* is not binding precedent but we assume for purposes of this discussion that it is correct.[8] Nevertheless, it is distinguishable. As Net-Bank's attorney argued before the bankruptcy court:

Certainly if you sell a piece of chattel paper, it does come with all the rights that are thereunder. But the flip side of that is not true. If you buy some of the pieces under the chattel paper [i.e. the

payment streams], it doesn't mean that you're getting the chattel paper as well. Transcript Dec. 20, 2004, p. 50:13–17.

In other words, delivery of the chattel paper may "operate[ ] to transfer" a perfected interest in the associated payment streams, as *Commercial Management* holds, but that does not mean that payment streams *are* chattel paper. When stripped from the chattel paper they are payment intangibles.

■ Trustee argues that the automatic perfection of payment intangibles in Revised UCC § 9–309(3) was only intended to address loan participations, not the payment streams in this case. We are not persuaded. Nothing in the statute limits its application to loan participations. *See* Nev.Rev.Stat. § 104.9309(3) (stating simply, "The following security interests are perfected when they attach: . . . (3) a sale of a payment intangible," without mentioning loan participations). The official comments imply that a participation is just one type of interest that a party can assign in the monetary obligation. *See* Rev. UCC § 9–109, Official Comment 5 (a sale of chattel paper or certain other things, such as an account, "includes a sale of a right in the receivable, *such as* a sale of a participation interest") (emphasis added).

■ Trustee argues that our interpretation of the statute will lead to endless debates over whether particular assignments are actually sales or secured loans. Again, we are not persuaded. Many transactions fall clearly on one side or the other of the sale versus loan dichotomy.

8. *See generally* Rev. UCC § 9–109 Official Comment 5 (stating that a "'sale' of chattel paper" includes "a sale of a right in the receivable"); Rev. UCC § 9–313 Official Comment 2 (implying that delivery of a writing, such as tangible chattel paper, "operates to transfer the right to payment"); *Commercial Management*, 127 B.R. at 303–304 (quot-

ing authority that the advantages of chattel paper would be lost if possession of the records does *not* perfect an interest in the payment streams, and such perfection prevents a dishonest pledgor from "misleading a potential subsequent lender into believing that [the pledgor] is free to pledge that same property again . . .") (citations and footnotes omitted).

When the answer is not clear the UCC contemplates that courts will need to decide the issue. *See, e.g.,* Rev. UCC § 9-109, Official Comment 5 ("[N]either this Article nor the definition of 'security interest' in [Rev. UCC] Section 1-201 provides rules for distinguishing sales transactions from those that create a security interest .... "). If such decisions are too burdensome on the commercial markets or on litigants then the remedy is with the legislature and not the courts. *See generally Roger Falcke,* 116 Nev. at 588, 3 P.3d at 664 ("Where the language of a statute is plain and unambiguous ... there is no room for construction, and the courts are not permitted to search for its meaning beyond the statute itself") (citation omitted).

Trustee also argues that if Revised UCC Article 9 permits purchases of payment streams to be automatically perfected, as we have held, then this permits secret interests and will wreak havoc on the financing markets. According to Trustee, there is no way for a hypothetical financier to protect itself against the possibility that an entity such as Debtor will transfer interests in the same payment streams more than once. NetBank responds that payment stripping is a bedrock principle of the securitization industry and that Trustee's concerns are misplaced.

NetBank argues persuasively that, if the hypothetical financier is the first to perfect, then generally it will be first in priority. *See* Nev.Rev.Stat. § 104.9322(1)(a).[9] For these purposes it does not matter if the transaction was a sale or a secured loan because the UCC covers both, as we have discussed. Nor does it matter if the

financier's interest is in the payment streams alone or in the underlying chattel paper leases, because a perfected interest in chattel paper includes the associated payment streams, at least if the reasoning in *Commercial Management* applies. *Commercial Management,* 127 B.R. 296.

A more difficult example is if the financier purchased an interest in the chattel paper leases *after* Debtor had already sold the payment streams to someone else. The financier might have no way to know of that prior "security interest."[10] The holder of that secret interest might not have filed any financing statements, or taken possession of the leases, or given any other notice because, under our holding, its interest would be automatically perfected under Revised UCC § 9-309(3).

NetBank argues that the financier could protect itself by taking possession of the leases, which allegedly would give it priority over the secret interest under the special rule of Revised UCC § 9-330(b). That rule is codified in Nevada Revised Statutes § 104.9330(2):

**104.9330. Priority of purchaser of chattel paper or instrument.**

\*    \*    \*    \*    \*    \*

2. A purchaser [i.e., financier] has priority over a security interest [i.e. the secret interest] in the chattel paper which is claimed other than merely as proceeds of inventory subject to a security interest if the purchaser [financier] gives new value and takes possession of the chattel paper under NRS 104.9105 in good faith, in the ordinary course of [the financier's] business, and without knowledge that the purchase violates the

---

**9.** "1. Except as otherwise provided in this section, ... (a) Conflicting perfected security interests and agricultural liens rank according to priority in time of filing or perfection." Nev.Rev.Stat. § 104.9322(1)(a).

**10.** As noted at the start of this discussion, the term "security interest" includes sales, not just collateral for loans.

rights of the secured party [i.e., the holder of the prior but secret interest]. Nev.Rev.Stat. § 104.9330(2).[11]

We note that this special priority rule only applies by its terms to an interest "in the chattel paper." We have just held that the payment streams stripped from the leases are not chattel paper, so arguably this special priority rule is inapplicable, although Trustee has not argued the point. On the other hand, from the financier's point of view the assignment of an interest in chattel paper includes the associated payment streams, under the reasoning in *Commercial Management*. Therefore, for purposes of competing priorities under Revised UCC Section 9–330(b), the secret interest may be an interest in the financier's "chattel paper." We explicitly decline to resolve this ambiguity in Revised UCC Section 9–330(b), because neither that statute nor the hypothetical situations posed by the parties are before us on this appeal. It is sufficient for our purposes that the plain meaning of the "chattel paper" definition in Nevada Revised Statutes § 104.9102(1)(k) does not lead to a result that is demonstrably counter to the legislative intent. *Roger Falcke*, 116 Nev. at 588, 3 P.3d at 664; *Ron Pair Enters.*, 489 U.S. at 240–42, 109 S.Ct. 1026. If it turns out that the plain meaning of the "chattel paper" definition could cause problems under statutory provisions that are not at issue on this appeal, such as Revised UCC Section 9–330(b), then the answer lies either in the courts' interpretation of those provisions to harmonize the statute or in legislative amendment to the statute, not in disregarding the plain meaning of unambiguous provisions.

For all of these reasons we must apply the plain meaning of the statute: the payment streams separated from the underlying leases do not fall within the definition of chattel paper. Nev.Rev.Stat. § 104.9102(1)(k). Rather, these monetary obligations fall within the payment intangible subset of the catch-all definition of general intangibles. *See* Nev.Rev.Stat. § 104.9102(1)(b) ("Account") (UCC § 9–102(a)(2)); § 104.9102(1)(pp) ("General intangible") (UCC § 9–102(a)(42)); *and* § 104.9102(1)(iii) (redesignated as (hhh) by S.B. 201) ("Payment intangible") (UCC § 9–102(a)(61)).[12]

---

**11.** In the above hypothetical the chattel paper leases are sold to the financier, rather than assigned as security for a loan, but NetBank's argument is not limited to sales because the term "purchaser" includes not only a buyer but also a secured lender. *See* Nev.Rev.Stat. § 104.1201(2)(cc) ("'Purchase' means taking by sale, lease, discount, negotiation, mortgage, pledge, *lien, security interest,* issue or reissue, gift or any other voluntary transaction creating an interest in property.") (emphasis added) and (dd) ("'Purchaser' means a person that takes by purchase.").

**12.** Both NetBank and Trustee submitted declarations of expert witnesses, which the bankruptcy court excluded. The declarants—Professor Steven L. Harris for Trustee and Professor Charles W. Mooney, Jr. for NetBank—were the two reporters for the Permanent Editorial Board who worked on the revisions that became Revised UCC Article 9. NetBank argues that the bankruptcy court improperly struck this evidence "to the extent it constituted factual testimony from a key participant in the drafting of Revised Article 9" to clarify any ambiguity in the statute, citing *In re Boogie Enter., Inc.*, 866 F.2d 1172, 1174 (9th Cir.1989) (citing treatise by "Professor Gilmore, who helped draft Article 9 of the UCC"); *Ritzau v. Warm Springs West*, 589 F.2d 1370, 1376 n. 4 (9th Cir. 1979) (citing article by "principal draftsman" of uniform code). Trustee argues, among other things, that "[m]aterial not available to the lawmakers is not considered, in the normal course, to be legislative history." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 579, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). We need not decide this issue because if there was any error in excluding the Professors' declarations it was harmless: we have reviewed the declarations and they do not change our conclusions.

Because the payment streams are payment intangibles, NetBank's interest in them would be automatically perfected upon attachment under Nev.Rev.Stat. § 104.9309(3) if its transactions with Debtor were sales rather than loans. We now turn to that issue.

### B. *Debtor's transactions with NetBank were loans, not sales*

As noted above, the UCC leaves to the courts the decision whether a transaction is a loan or a sale. *See* Rev. UCC § 9–109, Official Comment 5. Although Nevada law governs, neither party has argued that there is anything distinctive about Nevada's approach to the issue and both parties treat decisions from other states as relevant.

NetBank argues that Trustee bears the burden of proving that the transactions were loans rather than sales, citing *In re Pillowtex*, 349 F.3d 711 (3d Cir.2003) (transaction was secured financing rather than true lease). *Pillowtex* held that the party seeking to re-characterize the transaction bears the burden of proof (349 F.3d at 716–17 & n. 6) and in this case it is debatable who that is, because contractual language supports both parties. The SSAs state on the one hand that the parties intend the transactions to be sales (§ 2.1(c)) and on the other hand that the transactions are intended to be indebtedness for tax purposes (§ 2.10). Nevertheless, we assume without deciding that Trustee bears the burden of proof.

NetBank also argues that there is nothing impermissible about intending different treatments for different purposes.

> [F]or bankruptcy and financial purposes, the parties will often structure the transaction as a sale. However, for tax purposes, a lessor will often try to structure a transaction as a secured loan to avoid paying tax which would be incurred by the immediate recognition of significant amounts of rental income unless a lessor can achieve a specific tax benefit from accelerating taxable income, such as utilizing an expiring net operating loss.

> Stuart M. Litwin and William A. Levy, "Securitization of Equipment and Auto Leases," reprinted in New Developments in Securitization 2002, § 30:3.15 (Practicing Law Inst. # A0–00E0).

■ NetBank's concern is misplaced. We do not read the bankruptcy court's decision as in any way criticizing the parties' attempt to characterize the same transaction in different ways for different purposes. Labels can make a difference, but in this case the labels are conflicting so they carry little weight. Labels also "cannot change the true nature of the underlying transactions." *Woodson*, 813 F.2d at 272.

■ Whether a transaction is a sale or a loan is based on the intentions of the parties as "determined from all the facts and circumstances surrounding the transactions at issue." *Golden Plan*, 829 F.2d at 709. NetBank argues that the bankruptcy court erred by excluding the declarations of its own executives and Debtor's former executives regarding their understanding of the transactions. The bankruptcy court stated, in a tentative ruling which it later reaffirmed:

> I'm looking at the [SSA] and ... it does appear to the Court that [the] agreement is unambiguous. I can't see the need for parol evidence. The bank has provided [various] declarations .... And in looking at ... the appropriate case law ... the Ninth Circuit *Woodson* case and the *Golden Plan* case, the most applicable to this matter, I just don't see the need for any parol evidence....

... [W]e're dealing with sophisticated parties. If the parties and their attorneys can't memorialize their understanding of the agreement, then I don't know who can.

[NetBank] cites some cases in support of its position; *Golden Plan* is one. There are a couple more cases.... [T]hose cases basically dealt with fraud issues, Ponzi schemes, hundreds if not thousands of investors getting prospectuses, getting told something by a sales person over the phone or in writing, and that's why the court let that testimony in, and that's completely different from what we have in this case.

Transcript Dec. 20, 2004, pp. 5:4–6:13.

■ We have already noted that the SSAs contain contradictory terminology, so we cannot agree with the bankruptcy court that the documents are unambiguous. Nevertheless, the declarations were properly excluded under the parol evidence rule.

■ We interpret *Golden Plan* to mean that testimony should be admitted or excluded consistent with the ordinary rules regarding parol evidence. *Golden Plan,* 829 F.2d 705. The SSAs include an integration clause. SSA § 10.1. Therefore, parol evidence is admissible to resolve ambiguities but not to "vary or contradict the terms of a written agreement." *Lowden Inv. Co. v. General Elec. Credit Co.,* 103 Nev. 374, 379, 741 P.2d 806, 809 (1987).

We must read the executives' declarations in the light most favorable to Net-Bank, as the non-moving party. *In re Stern,* 345 F.3d 1036, 1040 (9th Cir.2003). Nevertheless, we conclude that they either contradict the documents or add nothing to the documents and the undisputed facts.

The declaration of NetBank's senior lending officer, for example, states that if NetBank had viewed the transactions as loans then it would have insisted on promissory notes, extensive foreclosure rights, and personal guarantees from Debtor's principals. First, there is no dispute about what protections NetBank did or did not obtain. No declarations are needed on that issue. Second, from the face of the documents the parties obviously were aware that payment streams might later be "determined to be made as security for a loan by [NetBank] to [Debtor]." SSA § 2.1(c). The parties even granted Net-Bank a "first priority security interest" in contemplation of that possibility. SSA §§ 2.1(c), 10.8. Therefore, the declaration was properly excluded. *See generally Daly v. Del E. Webb Corp.,* 96 Nev. 359, 609 P.2d 319, 320 (1980) (excluding evidence that contradicted contract).

■ Turning to the documents, Net-Bank points out that in *Golden Plan* the Ninth Circuit reversed a finding that the transactions at issue were loans rather than sales, and did so despite the fact that the debtor or its agent retained physical possession of the property being sold and had a similar servicer "advance" provision. *Golden Plan,* 829 F.2d at 709–711. NetBank also notes that the courts do not give controlling weight to any one factor and not all factors need to point in the same direction. *See, e.g., Major's Furniture Mart, Inc. v. Castle Credit Corp.,* 602 F.2d 538, 544 (3d Cir.1979) (existence of recourse was not determinative).

NetBank cites numerous alleged characteristics of sales in the documents:

* sale terminology in the SSAs and other documents and the lack of "typical loan provisions" (presumably meaning guarantees, extensive foreclosure rights, and similar provisions);

* Debtor's assignment of the payment streams to NetBank "without recourse" (SSA § 2.1);

\* the fact that Debtor was permitted but not required to make Servicer Advances (SSA § 4.6);

\* NetBank's ability to assign its rights in certain circumstances (SSA § 2.9) which it characterizes as treating the payment streams as its own property;[13]

\* Debtor's lack of such rights (SSA § 6.4(c));

\* NetBank's purported inability to accelerate payments under the SSAs, and Debtor's purported lack of rights to repurchase or receive a reconveyance of the payment streams (SSA § 2.6);[14]

\* the fact that the interest rate is fixed, which NetBank characterizes as evidence that the "Interest Rate" is simply a mechanism to compute the present discounted value of the Transferred Property (SSA § 1.1); and

\* that Debtor allegedly "retained no residual interest in the payment streams upon their sale to NetBank."

On this last point NetBank argues that the reconveyance of the Transferred Assets at the end of the SSAs' 60–month Collection Period (SSA § 2.8) would not actually convey any payment streams because those payment streams will be exhausted when NetBank is paid the full "Original Principal Amount" plus all "Interest" amounts. Trustee acknowledges that typically there were 62 payments under each lease and the lessee made two payments to Debtor upon signing the lease so there were 60 remaining payments.

The exception, NetBank concedes, is that if Debtor made an "optional" Servicer Advance because a lessee failed to make a lease payment (SSA § 4.6) then Debtor would retain any lease payments that it received after termination of the SSAs along with any late fees. According to NetBank, these latter circumstances do not evidence that Debtor retained any interest in the payment streams. Trustee posits a situation in which the last 10 of 60 lease payments were not paid by the lessee and were advanced by Debtor to illustrate that Debtor could receive a substantial residual interest upon termination of the SSA.

Despite NetBank's arguments, the transactions bear far more hallmarks of a loan than a sale. Each month Debtor as Sub–Servicer is required to pay NetBank a minimum fixed amount ($258,270.47 in the sample SSA) plus any additional "interest" and "principal" amounts owing to NetBank, regardless of what is or is not paid by the lessees. See SSA §§ 1.1, 3.7, 4.7(a). Debtor's assignment of the Transferred Assets to NetBank is non-recourse but just like many non-recourse loans it is secured by Debtor's property, including the underlying leases and equipment. See SSA § 2.1(b). Debtor as Sub–Servicer bears all costs of collection from lessees (SSA § 3.1), NetBank pays no fees for this expense or any other costs of servicing the leases (SSA § 5.1), and if there is a shortfall at the end of the 60–month Collection

---

**13.** The SSA provides that NetBank "may assign or transfer the Transferred Assets and related security interests ... in whole but not in part to another financial institution," and if NetBank assigns a part interest then the conveyance "shall be exclusively between the [NetBank] and such assignees or transferees, and other parties [to the SSA] shall not in any respect be obligated to, nor shall they be required to deal or communicate with, such assignees or transferees." SSA § 2.9.

In our view this provision is entirely consistent with NetBank's role as a lender. It can sell participations in the loan, but unless it sells the entire loan the borrower (Debtor) and Sureties are entitled to deal solely with NetBank.

**14.** In fact, as NetBank concedes, upon a breach of warranty Debtor is obligated to repurchase the payment streams. See SSA § 2.6.

Period then Debtor as Sub–Servicer is required to make up the shortfall and pay ongoing "interest" until all "principal" is repaid in full (SSA § 2.8). At that point any residual value in the Transferred Assets is returned to Debtor with no possibility of NetBank receiving more than repayment of the "principal" and "interest" (*id.*) whereas Debtor can retain any subsequent payments and late fees paid by the lessees. SSA § 4.6. In other words, NetBank (1) has none of the potential benefits of ownership and (2) is contractually allocated none of the risk of loss.

These are strong indicia of a loan rather than a sale. The absence of risk "seems to result in a finding of a debtor-creditor relationship in most cases." *Woodson,* 813 F.2d at 271. *See also Lendvest,* 119 B.R. at 200 (transaction was loan where documents placed "risk of loss" on debtor and not investors); *In re S.O.A.W. Enterprises, Inc.,* 32 B.R. 279, 282 (Bankr.W.D.Tex. 1983) (transactions were disguised loans rather than sales where investor "ran no real risk"), *cited with approval in Golden Plan,* 829 F.2d at 709–10; *In re Evergreen Valley Resort, Inc.,* 23 B.R. 659, 661 (Bankr.D.Me.1982) ("a security interest is indicated if the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt" rather than retaining such surplus as one of the benefits of ownership) (citation omitted). *Compare Golden Plan,* 829 F.2d at 709 ("assumption of risk [by investors] strongly suggests that [they] were not in a creditor-debtor relationship with [the debtor]").

▉ NetBank argues that it now has a "real risk" of loss, as evidenced by the bankruptcy court's Judgment. NetBank misstates the issue. In determining whether parties intended a sale or a loan the issue is how risks are contractually allocated when the transactions were entered into. In this case the risk was allocated to Debtor. The fact that Debtor later became insolvent is irrelevant. In *Woodson* the debtor had not paid its investors and was in bankruptcy but the contractual risk was allocated to the debtor. Primarily for that reason the transaction was determined to be a loan rather than a sale. *Woodson,* 813 F.2d at 270–72.

▉ NetBank argues that the issue on this appeal is "not whether [Debtor] was relieved of the risks of owning the Leases" but "whether [Debtor] continued at risk *with regard to NetBank.*" (Emphasis added.) This is too narrow a reading of the transactions and of *Woodson* and the other cases cited above. For purposes of determining whether a transaction is a sale or a loan, one useful factor is who is economically at risk. Under the transaction terms described above, it is Debtor, not NetBank, which is contractually allocated the risk of loss if, for example, a larger number of lessees default than expected.

NetBank notes that the debtor in *Woodson* guaranteed a rate of return and monthly payments and purchased an insurance policy insuring those guarantees. *Woodson,* 813 F.2d 266. NetBank argues that these elements are not present in this case because (a) Debtor transferred the payment streams to NetBank without recourse or guarantees; (b) Surety guarantees performance by the lessees, not by Debtor; and (c) NetBank is not a party to any "private arrangements" between Debtor and Surety for indemnity and allegedly there is no evidence that NetBank was aware of the indemnity agreements when the SSAs were signed.

▉ Trustee objects that NetBank has raised this last issue for the first time on this appeal and that it is therefore procedurally improper. We agree. NetBank has not pointed us to any portion of the

excerpts of record in which it raised this issue. *In re E.R. Fegert, Inc.,* 887 F.2d 955, 957 (9th Cir.1989) ("appellate courts will not consider arguments that are not 'properly raise[d]' in the trial courts" meaning that "the argument must be raised sufficiently for the trial court to rule on it") (citations omitted).[15]

Alternatively, we reject NetBank's argument because it reverses the burden of proof. As a matter of law a surety would normally have a right of indemnity from one such as Debtor. *See generally Black & Decker (U.S.), Inc. v. Essex Group, Inc.,* 105 Nev. 344, 345, 775 P.2d 698, 699 (1989)("When one party is subject to liability, which, as between that party and another, the other should bear, the first party is entitled to full indemnity") (citation omitted). Therefore, absent evidence to the contrary, the transaction between NetBank and Debtor placed the ultimate risk of loss on Debtor. We asked NetBank's counsel about this at oral argument and he pointed us to no contrary evidence or special rule of law applicable to this case.

Alternatively, even if NetBank could show that it was ignorant of Debtor's specific contractual and legal obligations to indemnify Surety, the other transaction terms leave no doubt who has the ultimate risk of loss. Under the SSAs Debtor as Sub–Servicer "assumes all responsibility, as agent for and on behalf of the Servicer, to perform the duties of the Servicer hereunder." SSA § 3.7. As set forth above, those duties include paying NetBank all "principal" and "interest" regardless of what is or is not paid by the lessees, or for that matter what is or is not paid by Surety under its surety bonds. Debtor must continue to do these things as long as it remains the Sub–Servicer while absorb-

ing all costs and receiving no compensation. NetBank offers no reason why Debtor would agree to these terms unless Debtor was the ultimate obligor rather than Surety. Nor has NetBank explained why the SSAs would include the option of Servicer Advances—which presumably are useless to Surety because it would have to advance the same funds under its surety bonds—unless Debtor was ultimately responsible for all payments. Debtor's assets, including the underlying leases, are pledged to NetBank to secure the obligations under the SSAs. Therefore, even if NetBank was unaware of Debtor's obligation to indemnify Surety, the SSAs leave no doubt that the ultimate risk was on Debtor.

We agree with the bankruptcy court that the transactions were loans, not sales. Therefore, NetBank does not satisfy one of the criteria under Nev.Rev.Stat. § 104.9309(3) ("The following security interests are perfected when they attach: ... (3) a *sale* of a payment intangible[.]") (emphasis added). NetBank's interest was not automatically perfected.

## C. *Existence of a genuine issue of material fact*

NetBank alleges that there are genuine issues of material fact that preclude summary judgment for Trustee. NetBank argues that under the Royal Settlement Trustee is essentially acting for the benefit of Royal, not for Debtor's estate, and that it would be inequitable to deprive NetBank of millions of dollars of recovery in exchange for which the estate has received only a fraction of that amount from Royal. The Royal Settlement is not at issue on this appeal, NetBank cannot collaterally attack it, and as Trustee points out Net-

---

**15.** Trustee also argues that NetBank is factually wrong because an internal NetBank memorandum shows that it knew that the risk

of loss remained with Debtor. NetBank disagrees. This is a factual issue that cannot be resolved on appeal.

Bank actually supported the settlement before the bankruptcy court.

NetBank complains about the alleged inequity of permitting Trustee to gain from Debtor's misdeeds, but its opening brief on this appeal concedes that it cannot assert equitable defenses to a bankruptcy trustee's avoidance actions. It argues instead that Debtor failed to carry out its duties to perfect NetBank's security interest and that this should be considered in connection with Trustee's argument that the transactions at issue are loans rather than sales. This is a red herring. NetBank is a sophisticated commercial entity and nothing prevented it from verifying that financing statements had been filed, or from taking possession of the leases. If anything, the equities favor third party creditors who had no notice of NetBank's unperfected interests. The cases cited by NetBank bear no resemblance to the circumstances of this case. *See Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959) (party invoking statute of limitations allegedly induced delay); *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833 (8th Cir. 2005) (trustee brought negligence action, not avoidance action, and standing in debtor's shoes was barred by in pari delicto principle—that plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing); *In re Gaudette*, 241 B.R. 491, 497 (Bankr. D.N.H.1999) (distinguishing between actions brought by the trustee pursuant to avoiding powers and those brought by trustee as successor to debtor, as to which trustee stands debtor's shoes and is subject to same defenses).

■ NetBank argues that Trustee has the initial burden of proving a lack of perfection. We agree. *See In re Davison*, 738 F.2d 931, 936 (8th Cir.1984).

On the issue of financing statements, Trustee has met his burden. Trustee's Complaint alleges that the requisite financing statements were not filed. NetBank's Answer admits that it did not file them. NetBank cannot create a genuine issue of material fact by suggesting the possibility, unsupported by any evidence, that somebody else might have filed them. *See Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994) ("motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might someday reveal."). NetBank's opening brief on this appeal concedes that "if the transaction is characterized as a loan by NetBank to [Debtor] secured by chattel paper or payment intangibles [then] NetBank's security interest would be perfected *only* if NetBank can establish that it took possession of the Leases." (Emphasis added.)

■ NetBank's Answer suggests that it had actual or constructive possession. Its reply brief on this appeal concedes that "NetBank itself never took possession of the Leases" but NetBank argues that it had possession of the leases either through a third party agent or through Debtor as Sub–Servicer.

Debtor cannot be NetBank's agent. As a matter of law, an assignee cannot leave the debtor in possession of the collateral and then claim to have possession through the debtor as its agent. *See* Nev.Rev.Stat. § 104.9313(3) and (8) (referring to possession by person "other than debtor") and Rev. UCC § 9–313, Official Comment 3 ("The debtor cannot qualify as an agent for the secured party for purposes of the secured party's taking possession."). NetBank argues that we should disregard this limitation in the statute because Debtor was acting as Surety's agent not NetBank's agent. The only decision it cites involved creditors who had taken posses-

sion of the promissory notes at issue shortly after the transaction closed, and later commenced foreclosure proceedings by transferring those notes to the party they knew as their "trustee and fiduciary" who turned out to be the debtor's subsidiary, *not* the debtor. *In re Bruce Farley Corp.*, 26 B.R. 164 (S.D.Cal.1981). The collateral was not left in the control of the debtor. *Id.* at 165. The *Farley* court held that "[t]he *debtor's lack of possession* coupled with actual possession by the creditor, the creditor's agent or the bailee serves 'to provide notice to prospective third party creditors that the debtor no longer has unfettered use of his collateral.'" *Id.* (quoting *Heinicke Instruments Co. v. Republic Corp.*, 543 F.2d 700, 702 (9th Cir. 1976)) (emphasis altered). NetBank does not explain how possession by Debtor in this case would provide similar notice to third party creditors, assuming without deciding that *Farley* was correctly decided. *But cf. Heinicke*, 543 F.2d at 702 ("The notice function of U.C.C. § 9–305 would be defeated if the debtor, *or a person under the debtor's control*, were left in possession of the collateral") (emphasis added).

The remaining issues are whether NetBank had possession of the leases through a third party agent and whether NetBank thereby perfected its interest in the payment streams. *See Commercial Management*, 127 B.R. 296. NetBank claims that Debtor's books and records are unclear about who had possession prior to the Petition Date (Transcript, Dec. 20, 2004, p. 56:3–17) and that Royal or Amwest may have held the leases as its agent.

Trustee responds that the issue of possession was not disputed before the bankruptcy court. The bankruptcy court agreed, stating "[i]t is *undisputed* that NetBank did not perfect by either method [filing or taking possession]." (Emphasis

added.) Based on the excerpts of record before us, we disagree.

One way in which NetBank disputed the issue of possession was by moving to strike Trustee's stated "understanding" that Debtor had physical possession of the leases as contemplated by SSA § 2.2(b). The bankruptcy court granted NetBank's motion to strike this statement, both orally at the hearing on December 20, 2004, and in a written order on February 25, 2005. *See* Transcript, Dec. 20, 2004, pp. 7:1–17, 53:21–57:6. The parties also argued before the bankruptcy court regarding the effect of the Royal Possession Order and the Royal TRO.

Trustee points to the Royal Possession Order as evidence that Royal first obtained possession on or after the date of that order, but as NetBank points out that order deals with documents and records "not previously made available to the Sureties." That phrase supports NetBank's assertion that the Sureties may have had possession before the date of that order.

NetBank also points out that, prior to the Royal Possession Order, the Royal TRO ordered Debtor to "make available to Royal all books, records, and accounts related to the Royal bonded leases" within two days of receipt of that order. The Royal TRO is dated February 1, 2002, several weeks outside of the 90–day preference period asserted in Trustee's Complaint. *See* 11 U.S.C. § 547(b)(4)(A).

Trustee claims that the Royal TRO only directed Debtor to give Royal access to the leases, and that Debtor was not ordered to turn over the leases until the Royal Possession Order was issued. Trustee also claims that even if Royal had possession of the leases Royal never executed SSAs with NetBank and Royal only took over Amwest's role as Surety and not as Servicer. Based on these alleged facts, Trustee concludes that Royal could not have been

NetBank's agent and therefore NetBank could not have had possession of the leases through Royal. *See* Transcript, Dec. 20, 2004, p. 85:8–17.

Trustee's arguments only further establish that there are genuine issues of material fact as to who had possession, when, and in what capacity. This precludes summary judgment. *See TransWorld Airlines*, 913 F.2d at 684–85 (summary judgment improper "unless it is clear that more complete factual development could not possibly alter the outcome and that the credibility of the witnesses' statements or testimony is not at issue").

## V. CONCLUSION

NetBank entered into transactions with Debtor that were intentionally structured to have characteristics of both a loan and a sale. It relied on Debtor and others to file UCC–1 financing statements, or otherwise assure that its interests in the payment streams from Debtor's leases were perfected, if they were not automatically perfected.

We hold, contrary to the bankruptcy court, that the payment streams are payment intangibles under Revised UCC Article 9 and therefore could have been automatically perfected if the payment streams had been sold to NetBank. We agree with the bankruptcy court, however, that the transactions between NetBank and Debtor are not sales but are secured, non-recourse loans instead. Therefore, NetBank's interests were not automatically perfected. There remain genuine issues of fact and law as to whether NetBank's interests were perfected by possession through an agent such as Royal or Amwest. Trustee did not meet his burden on the factual issue by submitting uncontested evidence regarding who held the leases at the relevant times, nor did Trustee establish entitlement to a judgment as a matter of law by establishing that, contrary to *Commercial Management*, possession of the leases could not perfect an interest in the payment streams. These unresolved issues preclude summary judgment for Trustee.

Accordingly, we AFFIRM IN PART, REVERSE IN PART, AND REMAND.